**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

No. 95-1924

PEPSI-COLA BOTTLING COMPANY OF
FAYETTEVILLE, INCORPORATED,
Respondent.

On Petition for Review of an Order
of the National Labor Relations Board.
(11-CA-14889, 11-CA-15034, 11-CA-15181, 11-CA-15281,
11-CA-15289, 11-CA-15383, 11-CA-15556)

Argued: May 8, 1996

Decided: September 10, 1996

Before MURNAGHAN, NIEMEYER, and WILLIAMS,
Circuit Judges.

_____

Enforcement granted in part and denied in part and remanded by
unpublished per curiam opinion. Judge Murnaghan wrote a concur-
ring and dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Joel I. Keiler, Reston, Virginia, for Pepsi Cola Bottling
Company. Robert James Englehart, NATIONAL LABOR RELA-
TIONS BOARD, Washington, D.C., for NLRB. **ON BRIEF:** Freder-
ick L. Feinstein, General Counsel, Linda Sher, Associate General

Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Frederick C. Havard, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for NLRB.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

An Administrative Law Judge (ALJ) held that Pepsi-Cola Bottling Company of Fayetteville, Incorporated, engaged in numerous unfair labor practices in violation of 29 U.S.C.A. § 158(a)(1),(3), (5) (West 1973) of the National Labor Relations Act (Act). With slight modification, the National Labor Relations Board (NLRB) affirmed, concluding that substantial evidence supported the ALJ's holdings. See Pepsi-Cola Bottling Co. of Fayetteville, 315 NLRB 882 (1994). Accordingly, the NLRB ordered Pepsi to cease and desist all unlawful conduct, and it now petitions this Court to enforce its order. Conversely, Pepsi urges this Court to deny enforcement of the NLRB's order. We grant enforcement in part, deny enforcement in part, and remand to the NLRB for further proceedings consistent with this opinion.

I.

The American Federation of Labor (AFL-CIO) attempted to unionize Pepsi's employees and petitioned the NLRB to hold an election to determine if a majority of the employees would vote in favor of unionization; consequently, the NLRB's Regional Director ordered an election at which the United Food and Commercial Workers, Local 204, AFL-CIO-CLC (the Union) appeared on the ballot. In the ensuing showdown to determine whether unionization would prevail, Pepsi attempted to persuade its employees to disavow the Union, while the Union attempted to persuade the employees that unionization would result in superior wages and benefits.

2

On October 8, 1991 -- two days prior to the election to determine unionization -- Pepsi convened compulsory meetings of its employees to discuss the consequences of unionization. At these meetings, Pepsi General Manager Randall Kennedy informed the employees that there were thirty-four actions Pepsi could take in response to unionization, presenting these actions with a chart prepared by Pepsi counsel, Joel Keiler. In reviewing the chart, Kennedy told the employees that wages and benefits would freeze; bargaining would begin at ground zero; employees could receive diminished benefits; the Union would only gain the right to bargain for the employees, nothing more; the Union could encourage the employees to strike, which would not adversely affect Pepsi because it would permanently replace striking employees; in the event Pepsi employees had to secure employment elsewhere, Pepsi would inform potential employers of its former employees' pro-union activities; if a strike ensued, employees would not receive strike or unemployment benefits because they were first-time strikers, which would result in their receiving welfare; Union dues would be expensive (in demonstrating this point, Kennedy held up bags of groceries that purportedly represented the amount of union dues); and the Union would have no right to appear on company property or conduct union business. Finally, Kennedy informed the employees that there was a"war" between the Union and Pepsi -- the Union was controlled by attorneys in Durham, North Carolina, and Los Angeles, California, while Pepsi was controlled by a large Japanese conglomerate with thirteen plants throughout North Carolina. Regarding this "war," Kennedy rhetorically asked the employees which side of the "war" they thought would win and whether they wanted to be on the winning side.

Eventually, on October 11, 1991, by a narrow margin, the employees voted in favor of unionization, but the NLRB challenged three ballots on the grounds that the employees' names did not appear on the voter eligibility list. Accordingly, unionization hung in limbo, pending resolution of the challenged ballots.

While the NLRB investigated the challenged ballots, Pepsi employees complained that Pepsi retaliated against pro-Union activists. For instance, pro-Union employee Roger Deskin, a mechanic, stated that he was assigned to change tires and clean drains in the garage, tasks not assigned to him prior to his pro-Union activity. In

3

addition, Jimmy Evers, also a mechanic, was assigned to clean drains in the garage by digging sludge with a shovel, also a task not previously assigned to him prior to his pro-Union activity.

Also, in January 1992, while the challenged ballots were still being resolved, Pepsi implemented a wage increase at all of its North Carolina plants except the Fayetteville plant. Although a wage increase was budgeted for the Fayetteville plant in January 1992, Pepsi increased only the supervisors' wages, not those of the bargaining-unit employees. In the summer of 1992, after unionization, the wage increase was implemented for the Fayetteville employees, but Pepsi denied the wage increase to Felix Romero, who had left Pepsi, but returned after the wage increase had been implemented.**1**

Finally, on August 17, 1992, the NLRB resolved the challenged ballots in favor of unionization, resulting in thirty-five votes in favor of the Union and thirty-two opposed to unionization. Accordingly, on September 4, 1992, the NLRB issued a certification of unionization.

Pepsi thereafter unilaterally amended its work rules. Specifically, the NLRB contends that Pepsi improperly unilaterally amended: (1) the work hours for route salesmen by having them commence at 5:45 a.m. instead of 6:00 a.m. for the summer months; (2) the method of payment for "tell sell" and vending machine salesmen; (3) the policy regarding personal telephone calls, breaks, and lunch periods; (4) the method by which route salesmen are compensated for receipt shortfalls by requiring that they reconcile discrepancies daily, rather than weekly, as had been the former practice, which resulted in Jerry Parker's discharge for failing to comply with this policy, and (5) the vehicular moving violations policy, which resulted in Christopher Hyatt, Joseph Lee, Benjamin Curtis, and John Faass being discharged.

_____

**1** In its brief, the NLRB states that "there may have been other employees like Romero who were rehired after the wage increase was implemented and who were denied the increase. The identity of these individuals will be determined in compliance proceedings." (Petitioner's Brief at 10 n.2.) We have not been provided, however, with any similarly situated employees, nor have we been apprised of any compliance proceedings. As we discuss infra at 6-7, on remand, the parties are ordered to address the effect of any compliance proceedings and to identify any other employees similarly situated to Romero.

4

Eventually, the NLRB charged Pepsi with violating the Act, and a hearing was convened before an ALJ to resolve the charge. Material for purposes of our discussion, the ALJ determined: (1) Pepsi violated 29 U.S.C.A. § 158(a)(1), (3) by withholding wage increases to the Fayetteville bargaining-unit employees; (2) Pepsi violated § 158(a)(1), (3) by assigning more onerous tasks to Deskin and Evers because of their pro-union activities; and (3) Pepsi violated 29 U.S.C.A. § 158(a)(1), (5) by unilaterally amending the employees' conditions of employment and by failing to furnish the Union with information necessary for bargaining.**2** The ALJ issued a cease and desist order prohibiting Pepsi from engaging in unfair labor practices, and it ordered Pepsi to reinstate Parker, Hyatt, Lee, Curtis, and Faass, make them whole and expunge any adverse information from their files, revoke any unilateral amendments to conditions of employment, and disclose information to the Union respecting Pepsi's hiring and discharge of employees. The NLRB affirmed the ALJ's conclusions and remedies, with the modification that Pepsi need not provide the contested information to the Union.

The NLRB petitions for enforcement of its order. We first address Pepsi's withholding the wage increase from the Fayetteville bargaining-unit employees. Second, we address the NLRB's contention that Pepsi assigned more onerous work to Deskin and Evers. Finally, we confront the issue of the unilateral amendments to the conditions of employment. We address only these three issues, and except as discussed below, we grant enforcement in all other respects.**3**

_____

**2** The ALJ also determined that Pepsi violated: (1) 29 U.S.C.A. § 158(a)(1) (West 1973) by informing its employees that unionization was futile, threatening its employees with the loss of benefits and plant closure if they opted for unionization, threatening employees by black-listing them and interrogating employees respecting their union activity; (2) § 158(a)(1), (3) in discharging Robert Munn; and (3) § 158(a)(3) in disciplining Deskin concerning his repair of an automobile brake. All of the ALJ's determinations are recited in the NLRB's opinion. See Pepsi-Cola Bottling Co. of Fayetteville, 315 NLRB 882 (1994). We affirm all of these conclusions.

**3** Pepsi half-heartedly raises two procedural arguments in its briefs to this Court. First, Pepsi contends that the ALJ could not conduct a hearing to determine whether Pepsi violated the Act because there was no quo-

5

II.

The Act provides that "[t]he findings of the[NLRB] with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C.A. § 160(e) (West 1973). Provided, therefore, the ALJ's factual determinations are supported by substantial evidence, we must affirm its conclusions if it properly applied the law. See NLRB v. Tamper, Inc., 522 F.2d 781, 785 (4th Cir. 1975). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison Co. v. NLRB , 305 U.S. 197, 229 (1938). "Substantial evidence" consists of more than a scintilla of evidence, but may be less than a preponderance. See Richardson v. Perales, 402 U.S. 389, 401 (1971). As we explained in Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (internal quotation marks omitted), "[i]f there is evidence to justify a refusal [to enter judgment as a matter of law] were the case before a jury, then there is `substantial evidence.'" In considering whether substantial evidence has been adduced, we may consider the evidence weighing against the ALJ's findings, but we may not substitute our judgment for that of the ALJ. See Consolidated Edison Co., 305 U.S. at 229-30. The ALJ, not the reviewing court, has the sole power to make credibility determinations. See NLRB v. Walton Mfg. Co., 369 U.S. 404, 406-09 (1962). This precept "is particularly true where, as here, the record is fraught with conflicting testimony and essential credibility determinations have been made." NLRB v. Nueva Eng'g, Inc. , 761 F.2d 961, 965 (4th Cir. 1985).

A.

The Act provides in pertinent part that "[i]t shall be an unfair labor practice for an employer to interfere with, restrain, or coerce employ-

_____

rum of the NLRB. Second, Pepsi asserts that it did not receive a fair hearing before the ALJ because counsel for the NLRB allegedly made misrepresentations to the ALJ, allegedly failed to disclose relevant discovery material, and allegedly failed to cooperate with Pepsi. In advancing these arguments, Pepsi provides no reasoning or authority for its positions. In our view, these arguments are wholly without merit.

ees in the exercise of the rights" to organize labor unions. 29 U.S.C.A. § 158(a)(1). Additionally, the Act provides in pertinent part that "[i]t shall be an unfair labor practice for an employer . . . [to] discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization;" 29 U.S.C.A. § 158(a)(3). For purposes of our discussion, the NLRB contends that Pepsi violated these provisions of the Act in two respects: (1) by budgeting wage increases for the Fayetteville bargaining-unit employees, but subsequently denying them in light of unionization; and (2) by assigning Deskin and Evers more onerous work.

1.

The NLRB first asserts that a wage increase was budgeted in January 1992 and was implemented at the other twelve Pepsi plants throughout North Carolina. In the summer of 1992, after the disputed ballots had been resolved in favor of unionization, Pepsi implemented the wage increase that had been budgeted for January 1992, but denied the wage increase to any former employee, like Romero, who had been rehired after the wage increase had been implemented.[4]

Pepsi does not dispute that the wage increase was budgeted and implemented at the other North Carolina Pepsi plants, but argues that the increase was discretionary, not compulsory. Additionally, Pepsi posits that the NLRB initially found the wage increase compulsory, then subsequently found it discretionary. According to Pepsi, because the NLRB took inconsistent positions regarding the wage increase, Pepsi cannot be held to have violated § 158(a)(1), (3).

Withholding of a wage increase may constitute a violation of § 158(a)(1), (3). See Southern Md. Hosp. Ctr. v. NLRB, 801 F.2d 666, 668-69 (4th Cir. 1986); see also Bonnell/Tredegar Indus. v. NLRB, 46 F.3d 339, 343-44 (4th Cir. 1995) (holding that an employer's established past practice of paying a Christmas bonus can become an implied term of a collective bargaining agreement and an employer's attempting not to disburse the bonus after an eighteen-year history of

_____

[4] **See** n.1, supra.

paying it violates the Act). If, however, a wage increase is discretionary or forms no term or condition of employment, then an employer may withhold it without violating § 158(a)(1), (3). See Phelps Dodge Mining Co. v. NLRB, 22 F.3d 1493, 1496-1500 (10th Cir. 1994) (holding that bonuses or "appreciation payments" made over a period of forty-seven months were not wages or conditions of employment because there was no established practice as to their disbursement and accordingly the employer was not required to bargain over this issue because these bonuses or payments were discretionary); Southern Md. Hosp. Ctr., 801 F.2d at 669-70 (holding that a one-time bonus and various pamphlets and newspaper articles that generally discussed bonuses did not create an established practice of bestowing a bonus and thus there could be no violation for denying a bonus). Determining whether Pepsi improperly withheld the wage increase requires us to focus on whether Pepsi engaged in an established practice of bestowing wage increases. See id. at 669. Absent an established practice of paying a wage increase, Pepsi did not violate § 158(a)(1), (3) because it did not break with the status quo. See id.

The parties have not submitted evidence that there was an established practice of awarding wage increases, and, if so, to whom they were awarded. On the record before us, we cannot determine how established any practice of paying wage increases was, nor can we determine whether any discretion entered the calculus for disbursing the wage increase. See Phelps Dodge Mining Co. , 22 F.3d at 1498-99 (explaining that an employer is free to bestow bonuses at its discretion, absent any unlawful motive); compare Bonnell/Tredegar Indus., 46 F.3d at 343-44 (holding that if a practice of paying Christmas bonuses is so established, it can become an implied term of a collective bargaining agreement, thereby depriving an employer of discretion to withhold it). Thus, we are left with a record that does not enable us to assess whether substantial evidence supports the ALJ's holding on this issue. In addition, the NLRB has not explained its inconsistent positions regarding the wage increase. Accordingly, we remand this issue to the NLRB with instructions to develop the record regarding the nature of the wage increase and to identify the employees, if any, affected by the wage increase. See Daily News of Los Angeles v. NLRB, 979 F.2d 1571, 1575-78 (D.C. Cir. 1992) (remanding to the NLRB the issue of whether the discontinuance of periodic but discretionary merit raises constituted an unfair labor practice and

noting that the NLRB had taken conflicting stances regarding this issue). On remand, the parties should address the number of years the wage increase was implemented, whether any discretion was employed in determining to implement it, why the NLRB advanced inconsistent positions concerning the wage increase, the effect of any compliance proceedings regarding this issue, and any other pertinent information.

2.

The NLRB next asserts that Pepsi violated § 158(a)(1), (3) by assigning, post-unionization, Deskin and Evers more onerous work, and Pepsi does not dispute this assertion. Specifically, the NLRB argues that Pepsi ordered Deskin and Evers to clean the garage drains and Deskin to change tires on a truck in retaliation for their pro-Union activities.

While an employer's meting out more onerous work to employees in light of their efforts at unionization may violate § 158(a)(1), (3), see NLRB v. Hale Container Line, Inc., 943 F.2d 394, 399 (4th Cir. 1991), we cannot conclude that substantial evidence supports the ALJ's determination that Pepsi violated § 158(a)(1), (3) by allegedly requiring Deskin to clean the garage drains. Here, Deskins's testimony concerning the task of cleaning the garage drains was contradictory: On direct-examination, he stated that he did not clean the drains prior to his pro-Union activity, but on cross-examination stated he cleaned no drains; moreover, he testified that he was not disciplined for his refusal to clean the garage drains. Because Deskin stated that he neither cleaned the garage drains nor was disciplined for his refusal to do so, we hold that substantial evidence does not support the ALJ's conclusion that Pepsi violated § 158(a)(1), (3) in ordering Deskin to clean the garage drains. See Consolidated Edison Co., 305 U.S. at 229-30 (explaining that an ALJ's decision must be supported by substantial evidence and in reviewing this decision, an appellate court may consider the evidence weighing against the ALJ's finding). We fail to perceive how an employer who has not disciplined an employee for failing to perform a duty assigned to him has violated § 158(a)(1), (3).

Equally, we cannot conclude that requiring Deskin to change tires constituted more onerous work. Deskin testified that he "believed"

9

that he changed four tires on a truck and perhaps performed this duty "[o]n various occasions." (J.A. at 139.) By his own admission, Deskin conceded that the reason he changed the tires was because a subcontractor, which usually performed this duty, could not change the tires at that point in time. Thus, Deskin merely changed the tires because that duty could not be performed by the party charged to do it; hence, there is not substantial evidence that Pepsi asked Deskin to change the tires in retaliation for his pro-Union activities. In addition, we note that requiring a mechanic to change tires in a pinch and perhaps on other occasions, as here, is not onerous. Compare Fieldcrest Cannon, 318 NLRB 54 (1995) (making employee push large bales of towels, when prior work was to empty trash cans, constitutes onerous work). Accordingly, we hold that Pepsi did not violate § 158(a)(1), (3) respecting Deskin.

Likewise, we cannot conclude that substantial evidence supports the ALJ's conclusion that Pepsi violated § 158(a)(1), (3) by requiring Evers to clean the garage drains. Evers testified that he cleaned the drains twice, and as a mechanic, he had to keep his area of the garage clean, which entails cleaning the drains. Requiring an employee to maintain his work area by occasionally cleaning drains does not constitute more onerous work so that it amounts to a violation of § 158(a)(1), (3).

B.

Finally, the NLRB argues that Pepsi violated § 158(a)(1), (5) by unilaterally amending the employees' conditions of employment. According to the NLRB, Pepsi improperly unilaterally amended: the work hours of route salesmen; compensation schemes for "tell sell" and vending machine salesmen; the policy regarding personal telephone calls, breaks, and lunch periods; calculation of receipt shortfalls by route salesmen; thereby resulting in Parker's discharge; and the vehicular moving violations policy, thereby resulting in Hyatt's, Lee's, Curtis's, and Faass's discharges.

Pepsi contends that the Union waived bargaining over the unilateral amendments. According to Pepsi, the Union had notice of these unilateral amendments, but rather than bargain, the Union filed an unfair labor practice charge, which, Pepsi posits, waives any com-

plaint about unilateral amendments implemented by an employer. In addition, Pepsi mounts two further defenses of its unilateral amendments: (1) the amendments are not genuine amendments, but are past practices that were noted in the employee handbook; and (2) the amendments are immaterial. These latter two conditions were not addressed by the ALJ or the NLRB.

Under § 158(a)(5) an employer's "refus[al] to bargain collectively with the representatives of his employees" is an unfair labor practice. 29 U.S.C.A. § 158(a)(5). In addition, § 158(d) establishes "the obligation of the employer and the representative of its employees to bargain with each other in good faith with respect to wages, hours, and other terms and conditions of employment." Fibreboard Paper Prods. Corp. v. NLRB, 379 U.S. 203, 210 (1964) (internal quotation marks omitted). Thus, a unilateral amendment with respect to any mandatory subject of bargaining is prohibited "for it is a circumvention of the duty to negotiate which frustrates the objectives of[§ 158(a)(5)] much as does a flat refusal." NLRB v. Katz, 369 U.S. 736, 743 (1962). If an employer unilaterally amends terms of employment without affording the Union an opportunity to bargain, the employer"minimizes the influence of organized bargaining" and emphasizes to its employees "that there is no necessity for a collective bargaining agent." May Dep't Stores Co. v. NLRB, 326 U.S. 376, 385 (1945). An employer is, therefore, precluded under § 158(a)(5) from unilaterally amending conditions of employment if it has not bargained with the Union regarding the unilateral amendments. See Oneita Knitting Mills, Inc. v. NLRB, 375 F.2d 385, 387-89 (4th Cir. 1967). Any challenged amendments to conditions of employment must be material. See Porta-King Bldg. Sys., Div. of Jay Henges Enters. v. NLRB, 14 F.3d 1258, 1261 (8th Cir. 1994).

In analyzing § 158(a)(5) violations respecting unilateral amendments in conditions of employment, notice to the Union and opportunity to bargain over proposed amendments are essential to the collective bargaining process. See NLRB v. Oklahoma Fixture Co., 79 F.3d 1030, 1036-37 (10th Cir. 1996). An employer cannot successfully contend that a union waived the right to bargain if it failed to notify the union respecting the unilateral amendments. See id. Of course, if the Union has notice of the employer's unilateral amendments, but does not act on them, then the Union waives the right to

11

bargain. See YHA, Inc. v. NLRB, 2 F.3d 168, 173-74 (6th Cir. 1993); NLRB v. Island Typographers, Inc., 705 F.2d 44, 51 (2d Cir. 1983). Moreover, "filing . . . an unfair labor practice charge does not relieve the Union of its obligation to request bargaining." Oklahoma Fixture Co., 79 F.3d at 1037. Determining whether notice has been sufficiently given is a fact-intensive question, the resolution of which does not lend itself to bright lines. See id. at 1036. To demonstrate that the Union waived the right to bargain over the unilateral amendments, Pepsi "must show the right to bargain was clearly and unmistakably relinquished." Bonnell/Tredegar Indus., 46 F.3d at 346 n.6. Thus, to resolve this issue, we must determine whether the Union had notice of the right to bargain, and if so, whether it waived the right to bargain.

Here, the Union alleges that it did not bargain with Pepsi respecting the challenged unilateral amendments because it had no notice of these amendments. Rather than specifically responding to this allegation, Pepsi generally asserts that it gave the Union notice, without providing any particulars, such as the type of notice, how the notice was conveyed, or the length of time the Union had in which to respond to the proposal to implement unilateral amendments. Indeed, neither the ALJ nor the NLRB addressed the issue of notice. In short, the parties have not provided sufficient facts, with concomitant citations to the Joint Appendix, to support their respective positions. We cannot, therefore, review whether substantial evidence supports the finding that Pepsi violated § 158(a)(5) in implementing unilateral amendments to conditions of employment. Accordingly, we remand this issue to the NLRB and order it to develop the record respecting this issue. On remand, the parties are instructed to describe any notice given by Pepsi, the manner in which Pepsi conveyed the notice, the period of time the Union had to respond to this notice, the materiality of the unilateral amendments, and any other pertinent information respecting notice.

III.

We conclude that substantial evidence does not support the ALJ's findings that Pepsi violated § 158(a)(1), (3) by requiring Deskin and Evers to clean the garage drains or by requiring Deskin to change tires. Accordingly, we deny enforcement of the NLRB's order in that

12

respect. Regarding the wage increase and the unilateral amendments to conditions of employment, we remand to the NLRB for further development of the record in these two respects. In all other respects, enforcement is granted.

## ENFORCEMENT GRANTED IN PART AND DENIED IN PART AND REMANDED

MURNAGHAN, Circuit Judge, concurring and dissenting:

While I agree with the majority's conclusion that Pepsi did not violate 29 U.S.C. § 158(a)(1) & (3) of the National Labor Relations Act by assigning more onerous tasks to two employees because of their pro-union activities, I disagree with its determination that remand is necessary to resolve the remaining issues. Thus, I cannot join the opinion in full.[1] Mindful that our task is to review for substantial evidence and proper application of the law rather than to substitute our own judgment for that of the ALJ and the Board, see Nance v. NLRB, 71 F.3d 486, 489-90 (4th Cir. 1995), I would grant enforcement with regard to the withheld wage increases and the unilateral amendments to employment conditions at the Fayetteville plant. Unlike the majority, I believe that substantial evidence supports the conclusion that Pepsi engaged in unfair labor practices in both respects.

The ALJ reasonably concluded from the testimony of company officials that the annual pay raise Pepsi bestowed on all of its North Carolina plants was "customary" and anticipated by employees and supervisors alike. While managers exercised some discretion in dividing the allotted amount among employees each year, they treated the pay raise itself as a given.[2] Because Pepsi thus established a practice of granting the annual raise, its withholding during the organizational effort of the increases budgeted for the Fayetteville employees was improper unless done for a legitimate business purpose. See Southern Md. Hosp. Ctr. v. NLRB, 801 F.2d 666, 668-69 (4th Cir. 1986). The

_____

[1] I concur in the majority's affirmance of the other violations found by the ALJ and the Board.

[2] For example, General Sales Manager Randall Kennedy testified that Pepsi had bestowed the raise each of the six years he had worked for the company and that if one plant got the increase, they all did.

record shows that Pepsi never offered any explanation for withholding the planned wage increases other than the contested union election. Moreover, even if the annual pay raise did not constitute an established practice, when considered along with the anti-union animus exhibited by Pepsi officials who threatened to freeze benefits if the Fayetteville employees unionized, the withholding of the wage increases from only the Fayetteville bargaining-unit employees clearly violated § 158(a)(1) & (3). See id. at 669 (explaining that even when there is no established practice of granting benefits, an employer's withholding of a benefit for anti-union reasons may violate the Act).

The ALJ's determination that Pepsi violated § 158(1) & (5) by unilaterally altering conditions of employment without notice to the union is similarly supported by substantial evidence. Under the Act, the union is entitled to notice and an opportunity to bargain over proposed material amendments to conditions of employment. See NLRB v. Oklahoma Fixture Co., 79 F.3d 1030, 1035-37 (10th Cir. 1996); Oneita Knitting Mills, Inc. v. NLRB, 375 F.2d 385, 388-89 (4th Cir. 1967). While the union may waive its bargaining right, Pepsi failed to show that the union clearly and unmistakably did so with regard to the changes at issue here. See Bonnell/Tredegar Indus. v. NLRB, 46 F.3d 339, 346 n.6 (4th Cir. 1995) (noting that the burden is on the party claiming waiver). Instead, the record supports the ALJ's findings that each challenged amendment was material, yet implemented without notice or negotiation with the union.**3** Thus, the union had no obligation to request bargaining over those changes. See Oklahoma Fixture Company, 79 F.3d at 1036-37.

Accordingly, I would enforce the Board's order in all respects except those pertaining to the alleged assignment of more onerous tasks.

_____

**3** While the parties may not have addressed the notice issue in their briefs, that omission alone fails to compel remand because substantial evidence exists in the record to support the ALJ's determination that Pepsi unilaterally altered several conditions of employment without notice, negotiation or waiver of the right to bargain.

14