### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### OKLAHOMA FIXTURE COMPANY, Respondent.

No. 95–9509.

United States Court of Appeals, Tenth Circuit.

March 28, 1996.

---

Joseph J. Jablonski Jr., Attorney, National Labor Relations Board, Washington, D.C. (Frederick L. Feinstein, General Counsel, Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Charles Donnelly, Supervisory Attorney, National Labor Relations Board, Washington, D.C., with him on the brief), for Petitioner.

Stephen L. Andrew (D. Kevin Ikenberry with him on the brief), of Stephen L. Andrew & Associates, Tulsa, Oklahoma, for Respondent.

Before ANDERSON, KELLY and HENRY, Circuit Judges.

PAUL KELLY, Jr., Circuit Judge.

Petitioner National Labor Relations Board ("NLRB" or "Board") seeks enforcement of its order issued in *Oklahoma Fixture Co.,* 314 N.L.R.B. 958, 1994 WL 475852 (1994), in which it found that Respondent Oklahoma Fixture Company ("OFC") violated Section 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (5). We deny enforcement.

### Background

Oklahoma Fixture Company is engaged in the manufacture of custom-designed store fixtures, such as showcases and back islands, for installation in retail establishments. OFC has plants in Tulsa, Oklahoma, and Bowling Green, Kentucky.

In 1991, OFC decided to hire in-house electricians for the first time; previously,

OFC had subcontracted its electrical wiring needs. After the electricians were hired, the International Brotherhood of Electrical Workers ("Union") filed a petition for election in order to be certified by the NLRB as the electricians' exclusive bargaining agent. The Union was chosen by a 10 to 3 vote.

In January 1992, the Union began collective bargaining with OFC. On May 14, 1992, however, before a contract had been finalized, OFC informed the Union that it was seriously considering a return to subcontracting. OFC explained that it was experiencing some problems with its wiring and thought it might lessen its risks and liability by returning to subcontracting. Another contract negotiation session was scheduled for June 8, 1992, but the parties understood that there would be no further use in contract bargaining if OFC decided to return to subcontracting.

In early June of 1992, OFC made the final decision to subcontract its electrical work at both its Tulsa plant and its non-union Bowling Green plant. On the morning of June 8, 1992, OFC notified the Union of its decision and cancelled the contract bargaining session scheduled for that afternoon. The following day, Tuesday, June 9, 1992, the electricians were terminated but paid through the end of the week. At no time during that week did the Union request bargaining over the effects of the subcontracting decision. In fact, the attorney for the Union admitted at trial not only that no request to bargain over effects was made, but that this case did not involve "effects" but rather the decision to close the electrical part of the business. It was also uncontroverted that the case did not involve the refusal to furnish information since it had been furnished.

In any event, the Union filed an unfair labor practice charge on June 9, 1992, which resulted in the issuance of a complaint against OFC by the NLRB. The complaint alleged that the subcontracting decision and termination of the electricians was motivated by anti-union animus in violation of § 8(a)(3) of the National Labor Relations Act ("Act"); that OFC failed to bargain over the decision to subcontract and the effects of that decision in violation of § 8(a)(5); and that various

threats and intimidating remarks were made by OFC supervisors to employees in violation of § 8(a)(1). After a trial, the Administrative Law Judge ("ALJ") concluded that OFC had made the decision to subcontract for legitimate entrepreneurial reasons and not because of anti-union animus. The ALJ also found no § 8(a)(1) violations; held that OFC had no duty to bargain over its subcontracting decision; and determined that effects bargaining was not at issue in the case. Consequently, the ALJ dismissed the complaint in its entirety.

The General Counsel for the NLRB then filed exceptions to the ALJ's decision. The Board upheld the ALJ's decision on all points but three: (1) a statement made by a supervisor to one of the electricians constituted a threat under § 8(a)(1); (2) effects bargaining was at issue, and OFC failed to provide the Union with a meaningful opportunity to bargain over the effects of the subcontracting decision; and (3) the Union had not waived its right to bargain over effects. *Oklahoma Fixture Co.*, 314 N.L.R.B. at 958, 960–61. As a remedy, the Board required that a notice be posted advising employees that OFC had violated the Act, directed OFC to bargain with the Union over the effects of the subcontracting decision, and ordered a limited backpay remedy pursuant to *Transmarine Navigation Corp.*, 170 N.L.R.B. 389 (1968). *Oklahoma Fixture Co.*, 314 N.L.R.B. at 961.

### Discussion

■■■ Although we ordinarily review questions of law *de novo*, the Board's construction of the National Labor Relations Act is entitled to considerable deference. *Intermountain Rural Elec. Ass'n v. NLRB*, 984 F.2d 1562, 1566 (10th Cir.1993). The Board's findings of fact are upheld if they are supported by substantial evidence in the record as a whole. *Id.*; 29 U.S.C. § 160(e). "Substantial evidence" is evidence that a reasonable mind might accept as adequate to support a conclusion. *Intermountain*, 984 F.2d at 1566.

### I. Section 8(a)(1)

■■■ The Board, contrary to the decision of the ALJ, found that OFC threatened electri-

cian Richard Gill ("Gill") with discharge in violation of § 8(a)(1) of the Act. *Oklahoma Fixture Co.*, 314 N.L.R.B. at 958. In February 1992, Gill asked Superintendent Jerry Wallace ("Wallace") about health insurance contributions. When Wallace failed to respond to his inquiries, Gill spoke to fellow employee Ray Creel ("Creel") about the situation but did not contact the person in charge of the company's insurance program. Creel in turn contacted Union business agent Tom Quigley ("Quigley"), though Gill himself never actually spoke with a Union agent. Quigley eventually called Vice President Mark Cavins ("Cavins") about Gill's insurance. According to Gill, sometime thereafter, Supervisor Bob Fields mentioned to him that Cavins was angry at him because Cavins had been "chewed out" by Quigley over the insurance situation and warned him to stay out of Cavins' way. Creel testified that he heard this Fields–Gill conversation and that Fields said that Cavins was mad because "[h]e didn't like anybody from ... outside [the company] calling in about [Gill's] benefits or anything." Cavins testified that Quigley called him regarding Gill's insurance, but according to Cavins, the conversation was pleasant and that he was not angered by it, though he wondered why Quigley, an outside source, called him. Cavins explained that such calls were frequent from representatives of other Unions but surprising from Quigley because the electricians were still non-union at the time.

The ALJ found Gill's testimony "so amorphous and nebulous" that it was not clear that the threat was intended to discourage Union activity. The Board disagreed, finding that Gill's testimony clearly established that Fields warned Gill that a vice president of OFC wanted to fire him because the Union interceded regarding his insurance issue, which would discourage Gill from seeking the assistance of the Union.

■ It is well settled that an employer violates § 8(a)(1) by threatening employees with reprisal for engaging in union activity. *See McLane/Western, Inc. v. NLRB*, 723 F.2d 1454, 1456 (10th Cir.1983). The test for a violation of § 8(a)(1) is whether the employer engaged in conduct which reasonably tends to interfere with, restrain or coerce employees in the free exercise of their rights under § 7. *Lear Siegler Inc. v. NLRB*, 890 F.2d 1573, 1580 (10th Cir.1989).

■ Although the Board is entitled to deference in its findings of fact, its findings must still be supported by substantial evidence in the record as a whole. *Intermountain*, 984 F.2d at 1566. "[E]vidence may properly be considered less substantial when the NLRB's administrative law judge, who has observed the witnesses and lived with the case, has drawn conclusions different from those reached by the NLRB." *Monfort, Inc. v. NLRB*, 965 F.2d 1538, 1541 (10th Cir.1992) (internal quotations omitted). While the Board may draw permissible inferences from credible testimony, *NLRB v. Gold Spot Dairy, Inc.*, 417 F.2d 761, 762 (10th Cir. 1969), the Board cannot postulate findings unsupported by any evidence. In this case, there is absolutely no evidence in the record that Cavins' alleged threat against Gill was motivated by anti-Union animus in any way. At most the evidence suggests that Cavins may not have liked "outsiders" meddling in his company's affairs. The only suggestion that this dialog was motivated by anti-Union animus appears as argument by counsel for the Board, not in the form of testimony. In the absence of any evidence of anti-Union intent, under the facts of this case we cannot presume any improper motive.

## II. Effects Bargaining

The Board determined that the subcontracting decision itself was outside the scope of mandatory bargaining under the Act, and OFC's failure to bargain over that decision did not violate § 8(a)(5) or (1) of the Act. *Oklahoma Fixture Co.*, 314 N.L.R.B. at 959–60; *see First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 686, 101 S.Ct. 2573, 2584, 69 L.Ed.2d 318 (1981) (holding that a company is not required to bargain over the decision to shut down part of its business for purely economic reasons). However, the Board found that OFC was required to bargain about the effects of its decision to subcontract, and that by failing to give the Union adequate notice and an opportunity to bargain over the effects of its decision, OFC

violated § 8(a)(5) and (1). *Oklahoma Fixture Co.,* 314 N.L.R.B. at 960–61; *see First Nat'l Maintenance,* 452 U.S. at 681–82, 101 S.Ct. at 2582.

### A. Notice

■■■■ The National Labor Relations Act, as codified, states that it is an unfair labor practice for an employer "to refuse to bargain" over "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5) and (d). The subject matter of mandatory bargaining has been interpreted to include the "effects" of management decisions. *See First Nat'l Maintenance,* 452 U.S. at 681, 101 S.Ct. at 2582. The Supreme Court has stated:

> There is no dispute that the union must be given a significant opportunity to bargain about these matters of job security as part of the "effects" bargaining mandated by § 8(a)(5). And, under § 8(a)(5), bargaining over the effects of a decision must be conducted in a meaningful manner and at a meaningful time, and the Board may impose sanctions to insure its adequacy.

*First Nat'l Maintenance,* 452 U.S. at 681–82, 101 S.Ct. at 2582 (citations omitted).[1] "A concomitant element of 'meaningful' bargaining is timely notice to the union of the decision to close, so that good faith bargaining does not become futile or impossible," *Penntech Papers, Inc. v. NLRB,* 706 F.2d 18, 26 (1st Cir.), *cert. denied,* 464 U.S. 892, 104 S.Ct. 237, 78 L.Ed.2d 228 (1983), and "[t]he [decision] cannot be a 'fait accompli' which would make good-faith bargaining 'futile or impossible,'" *NLRB v. Emsing's Supermarket, Inc.,* 872 F.2d 1279, 1286 (7th Cir.1989) (citing *Penntech Papers,* 706 F.2d at 26, and *NLRB v. National Car Rental Sys.,* 672 F.2d 1182, 1189 (3rd Cir.1982)). The Board, without supporting evidence, determined that OFC did not afford the Union a meaningful opportunity to bargain about the effects of the subcontracting decision, stating, "we find that [OFC] announced its decision to terminate the bargaining unit in a manner that precluded meaningful bargaining over the effects on unit employees." *Oklahoma Fixture*

Co., 314 N.L.R.B. at 960. The Board expressly did not determine how many days' notice would constitute a meaningful opportunity to bargain, only holding that OFC's "1–day notice" was "clearly insufficient." *Id.* at n. 5. Whether an employer has provided meaningful and timely notice is essentially a question of fact, and the Board's findings in this regard are to be accepted if supported by substantial evidence. *Emsing's Supermarket,* 872 F.2d at 1287.

■■■■ As an initial matter, we disagree with the Board's determination that OFC only afforded the Union one days' notice. Although OFC announced the terminations on Tuesday, one day after notifying the Union of the decision, the company continued to pay the electricians through the end of the week. Thus, at a minimum, the Union had four days' within which to request bargaining. It did nothing but file a complaint the very next day. Meaningful effects bargaining could certainly have been requested and could have occurred during the four days when the electricians, though terminated, were still being paid. Under the case law, the fact that the employees were still on the payroll is an important determinant of the Union's leverage and bargaining power; indeed, the Board's standard *Transmarine* remedy to effectuate bargaining only requires the company to pay, not rehire, the employees. *Accord Kirkwood Fabricators, Inc. v. NLRB,* 862 F.2d 1303, 1307 (8th Cir. 1988) (the court also approved of the Board's limited back pay remedy, reasoning that it "provid[ed] the Union some measure of bargaining strength which it would have had if [the company] had engaged in effects bargaining at the appropriate time.").

OFC contends that meaningful effects bargaining in this case could have occurred after the terminations and even after the electricians were removed from the payroll. The company argues that even if the subcontracting decision was presented to the Union as a fait accompli, the company and the Union could still have meaningfully bargained over effects even after the employees were terminated. Under the facts of this case, these

---

1. The notice requirement has been excused in cases of emergency. *See Daniel I. Burk Enter.,*

313 N.L.R.B. 1263, 1268, 1994 WL 213882 (1994), and cases cited therein.

contentions have merit. In several cases the Union did not request effects bargaining until long after the termination decision was completely effectuated, suggesting that meaningful effects bargaining can occur even after the termination decision has been completely implemented. *See, e.g., Orbitron Indus., Inc.,* 319 N.L.R.B. No. 117, 1995 WL 732848 (1995) (company ceased operations at its plant on December 31, 1993, and Union did not request effects bargaining until October 19, 1994).

■ The Board properly found that the Union had no right to bargain over the subcontracting decision itself, only its effects, and this effects bargaining could be meaningfully conducted even after the employees were removed from the payroll. *See Creasey Co.,* 268 N.L.R.B. 1425, 1984 WL 36116 (1984). In *Creasey,* the Union was informed on November 2 that the company would close on November 5; the company bargained with the Union on November 3, 4, 10, and 15, and December 12. The Board did not consider that the fact that several of the bargaining sessions occurred after the company was closed affected the "meaningfulness" of the bargaining. We do not decide at what time the window for meaningful effects bargaining closes, but the window does not automatically close upon the implementation of a termination decision.

■ We turn now to the adequacy of the notice given in this case. Adequacy of notice is essentially a question of fact, and as such, the amount of notice required may vary somewhat from case to case. In some situations, if the company is not required to bargain about the termination decision, it may not be required to give any notice at all with regard to effects bargaining. *See Chippewa Motor Freight, Inc.,* 261 N.L.R.B. 455, 460, 1982 WL 24447 (1982); *accord Daniel I. Burk,* 313 N.L.R.B. at 1268 (notice requirement excused in cases of emergency). In other situations, more notice might be required in order for meaningful bargaining to occur simply because there are more issues on the table. For example, unlike the case before us, a company may have multiple divisions or departments that could utilize the services of employees working in the affected division, and with enough notice, employees could be transferred to these other divisions.

The cases fail to yield a bright-line rule as to what constitutes adequate notice. *Compare Emsing's Supermarket,* 872 F.2d at 1287 (three or four days' notice insufficient), *with Chippewa,* 261 N.L.R.B. at 460 (two days notice adequate). The discrepancy seems to stem in part from the underlying factual situations in the cases; the cases seem to turn on whether the employer "refused to bargain" rather than the amount of prior notice. *See, e.g., Kirkwood Fabricators,* 862 F.2d 1303 (holding that same day notice was inadequate where the Union requested effects bargaining six days after the company was sold, but the company refused to meet with the Union); *Penntech Papers,* 706 F.2d 18 (holding that same day notice was inadequate where company failed to bargain in good faith after the closure). Further, some cases are implicitly or explicitly premised on a position that we explicitly reject, namely that the window for meaningful effects bargaining always closes upon termination, *see, e.g., Emsing's Supermarket,* 872 F.2d 1279; rather, the adequacy of notice depends on the facts of a given case.

Based upon the record before us, we find that four days' notice constituted adequate notice to effectuate meaningful effects bargaining under the facts of this case. Increased notice would fail to serve any purpose in this case. The Union had ample time to request effects bargaining, and meaningful bargaining could have taken place both during the four days or thereafter. At no time did the OFC "refuse to bargain." Further, given the brevity of the electricians' employment and considering the nature of the decision, there were few effects over which to bargain, making additional notice superfluous. A situation involving more established employees might present more effects over which to bargain, such as pension contributions, possible intracompany transfer, seniority concerns, and so forth. In this case, the only issue was the amount of severance pay.

## B. Waiver

■ Once the company provides appropriate notice to the Union, the onus is on

the Union to request bargaining over subjects of concern. *NLRB v. Island Typographers, Inc.,* 705 F.2d 44, 51 (2d Cir.1983). If the Union fails to request bargaining, the Union will have waived its right to bargain over the matter in question. *Id.; Associated Milk Producers, Inc.,* 300 N.L.R.B. 561, 563, 1990 WL 180527 (1990). A waiver of a statutory bargaining right must be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). However, "a union cannot simply ignore its responsibility to initiate bargaining over subjects of concern and thereafter accuse the employer of violating its statutory duty to bargain." *Island Typographers,* 705 F.2d at 51. Further, the filing of an unfair labor practice charge does not relieve the Union of its obligation to request bargaining. *Associated Milk Producers,* 300 N.L.R.B. at 564 ("[I]t [i]s incumbent on the Union to request bargaining— not merely to protest or file an unfair labor practice charge.").

In this case, the Union candidly admits it never requested effects bargaining at any time during the week of the June 8th, or any time thereafter, thereby waiving its right to effects bargaining. The Union's chief negotiator testified that he "knew we could bargain over the effects of [the decision]," but that he chose not to request bargaining because he was concerned only with the decision itself, rather than its effects. The Union negotiator's comments clearly indicate that the Union intended to waive its rights to effects bargaining. The negotiator's statement clearly suggests that the Union failed to request effects bargaining because it never desired effects bargaining.

■ The Union's failure to raise an issue does not constitute waiver of its right to bargain over the issue if the Union is led to believe that an attempt to bargain over the issue would be futile. *Intermountain,* 984 F.2d at 1568; *accord NLRB v. National Car Rental Sys., Inc.,* 672 F.2d 1182, 1189 (3rd Cir.1982). However, in this case there was no indication that the company would refuse to bargain over effects. To the contrary, the record is uncontroverted that Vice President Cavins testified that he was authorized to bargain over severance benefits upon request and authorized to increase the amount of severance pay.

In *American Diamond Tool, Inc.,* 306 N.L.R.B. 570, 1992 WL 44698 (1992), the Board held that Union waived its right to bargain over layoffs despite the lack of any prior notice of the layoffs. The Board found the combination of three factors constituted waiver: (1) the Union had actual notice of the layoffs after they took place; (2) the union had an opportunity to object to these layoffs at subsequent bargaining sessions; and (3) the company engaged in good faith bargaining, and there was no evidence that it would not have bargained about the layoffs. *Id.* at 570. The Board noted that the absence of notice was an "important fact" suggesting the unlawfulness of the layoffs, but the Union subsequently led the company to believe that it did not object, thus constituting waiver. *Id.* at 571.

In this case the Union had advance notice of the subcontracting decision, the Union had ample opportunity to request bargaining both during the week that the electricians were still on the payroll and thereafter, and there was evidence of willingness on the part of the company to bargain about effects. In light of all these factors, the Union's failure to request bargaining waived its right to bargain over the effects of the company's subcontracting decision.

ENFORCEMENT DENIED.