106 F.3d 413
 154 L.R.R.M. (BNA) 2800, 133 Lab.Cas. P 11,758,
97 CJ C.A.R. 152
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 BLUE CIRCLE CEMENT COMPANY, INC., Petitioner/Cross-Respondent,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent/Cross-Petitioner.
 No. 96-9503.
 United States Court of Appeals, Tenth Circuit.
 Jan. 24, 1997.
 
 Before KELLY, HOLLOWAY and WEIS,** Circuit Judges.
 ORDER AND JUDGMENT*
 WEIS, Senior Circuit Judge.
 
 
 1
 For a number of years the employer, Blue Circle Cement Company, and the Union, the United Cement, Lime, Gypsum and Allied Workers Division of the International Union of Boilermakers, Iron Ship Builders, Forgers and Helpers, AFL-CIO and its Local D-421, operated under collective bargaining agreements. Before expiration of the 1987-1990 contract, the Union was advised by the employer of its desire to negotiate a new agreement.
 
 
 2
 Although the parties held a number of bargaining sessions, they were unable to reach agreement. In a letter dated November 12, 1990, the employer declared an impasse and stated that, as of November 19, 1990, it would put certain terms of its final offer into effect.
 
 
 3
 From November 1990 through June 1992, the employer implemented several changes without first bargaining with the Union. Those measures included provisions governing: the starting time of the "A" shift; the scheduling of vacation times; the location where employees could take their coffee and meal breaks; the revocation of premium pay for certain employees; the reduction of break periods during plant shutdown; as well as other matters not currently in dispute.
 
 
 4
 In 1992, the Union filed unfair labor charges with the National Labor Relations Board. After a hearing before an ALJ, the Board found that the employer had violated sections 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(5) and (1). The employer has sought review of the order and the Board asks for enforcement.
 
 
 5
 When an employer and a Union bargain to a good-faith impasse, the employer may alter the status quo by implementing unilateral changes to terms and conditions of employment whenever the changes were reasonably comprehended within the terms of pre-impasse offers. Colorado-Ute Elec. Ass'n v. NLRB, 939 F.2d 1392, 1404 (10th Cir.1991); American Fed'n of Television & Radio Artists v. NLRB, 395 F.2d 622, 624 (D.C.Cir.1968). The Board's findings of fact are subject to a "substantial evidence" standard of review. NLRB v. Oklahoma Fixture Co., 79 F.3d 1030, 1033 (10th Cir.1996). We will discuss the various charges seriatim.
 
 1. Break Schedules During Shutdown
 
 6
 The Board concluded that the employer committed an unfair labor practice by changing the employees' break schedule during a 1992 plant shutdown. The employer did not challenge the ALJ's finding on this point and, in argument in this Court, has conceded that the Board's order should be enforced. We will enter an appropriate Order to that effect.
 
 2. Shift Starting Times
 
 7
 Prior to May 1992, the employer required the "A" shift to begin at 12:00 midnight and continue until 8:00 a.m. On May 25, 1992, the employer directed that the "A" shift begin at 11:00 p.m. and continue until 7:00 a.m. The employer asserts that it had authority to take this step under the expired collective bargaining agreement and points to Article IX, captioned Wage and Shift Differentials, for support. Section 4 of that Article reads in pertinent part: "For purpose of this Article, shifts shall be identified in accordance with the following: The A, or morning or first shift, shall include work regularly scheduled to commence between 11:00 pm. and 12:00 midnight, inclusively." Article IX, section 5 provides that each employee working on the morning shift was to be paid a shift differential of 65 cents per hour.
 
 
 8
 The Union contends that Article IX applies only to rates of pay and does not define appropriate shift starting times. Instead, the Union relies on Article VI--"Working Conditions." Section 4(a) of that Article states:
 
 
 9
 For the purpose of this Agreement, it is understood that the workweek shall begin on Monday at 12:01 a.m. and extend to Sunday at 12:00 p.m. midnight. Each work day shall start at 12:01 a.m. and end at 12:00 p.m.
 
 
 10
 Section 4(b) of the same Article provides that a shift consists of eight straight hours, which "shall be within one 24-hour period, defined in the contract as the workday." Thus, as the Union reads the contract, the "A" shift can commence no earlier than 12:01 a.m. of any work day.
 
 
 11
 The ALJ found that the employer had changed the shift hours to accommodate the "B" shift employees who preferred to work in the cooler hours of the day. Moreover, the shift schedule remained the same after the maintenance manager arranged to have the employees state their preferences with respect to continuing the revised schedule.
 
 
 12
 The employer had not made a pre-impasse proposal to alter the shift hours and the ALJ interpreted the contract to deny the employer the right to do so unilaterally. The Board rejected the employer's argument that seasonal fluctuations in shift starting times was a long-standing practice that had become a term of employment. The ALJ also concluded that the employer committed an unfair labor practice by dealing directly with the employees rather than through the Union. The Board affirmed the ALJ's findings and additionally held that the employer did not retain discretion to change the shift hours after impasse.
 
 
 13
 We owe no deference to the Board's interpretation of the collective bargaining agreement, however, on our own independent review, we conclude that the Union's view of the matter is correct. Article IX is limited to discussing wages and shift differentials and section 4 of that Article is limited by its terms to Article IX. On the other hand, Article VI refers to working conditions and section 4 of that Article refers to "this Agreement." Thus, section 4 of Article VI is broad in scope while section 4 of Article IX is narrow and limited to the subject of shift differential pay, not the hours that may be scheduled.
 
 
 14
 The terms of Article VI clearly provide that the work day begins at 12:01 a.m. and that a shift must take place within one work day. In view of that language, the decision of the employer to schedule the first shift to begin in one work day (beginning at 11:00 p.m.) and terminating in another work day eight hours later violated the terms of the collective bargaining agreement. Because there was no pre-impasse offer to change the shift hours, the employer could not unilaterally change that arrangement.
 
 
 15
 Our interpretation of the contract makes it unnecessary for us to address the Board's alternative holding that managerial discretion terminated when the collective bargaining agreement expired. We specifically decline to address the Board's ruling on that point.
 
 
 16
 We also conclude that substantial evidence in the record supports a finding that the employer violated the Act by its direct dealing with employees. Even though the attempt to discover their opinions with respect to change in the shift starting time was far from egregious, we conclude it was not unreasonable for the Board to decide that in so doing the employer violated the Act. See Facet Enters., Inc. v. NLRB, 907 F.2d 963, 969 (10th Cir.1990). Accordingly, the Board's order on this issue will be enforced.
 
 3. Vacation Scheduling
 
 17
 Article X of the collective bargaining agreement provides that, insofar as practicable, vacations would be granted at the time most desired by the employees, but the final right to allocate vacation periods was reserved to the employer. That Article further obligated the employer to meet with the local plant committee to discuss scheduling of as liberal a vacation allotment as possible, consistent with operation requirements.
 
 
 18
 It was a well-established practice that, before 1992, employees were allowed until March 1 of any given year to state their vacation preferences. The employer granted pre-March 1 requests on the basis of seniority. Post-March 1 requests were awarded on a first-come basis. Employees were free to make requests late in the year on the probability that supervisors would approve on short notice.
 
 
 19
 Because of difficulties with the system in 1991, the employer changed its procedures in 1992 by strongly encouraging employees to submit preferred vacation times before March 1. If an employee failed to comply with that deadline, the employer would then schedule the vacation, leaving it incumbent on the employee to request a change if the allotted time was unsatisfactory.
 
 
 20
 The Union contended that the employer changed the procedure without bargaining and that the new policy had not been included in any pre-impasse proposal. The employer argued that because the final right to vacation time allocation was exclusively within its control, the revised policy was within the scope of the collective bargaining agreement.
 
 
 21
 The ALJ found that the employer's revised policy was a limitation on the employee's freedom to schedule and was a substantial change affecting a term of employment. A majority of the Board affirmed the ALJ's decision on the ground that managerial discretion in this circumstance did not survive the termination of the collective bargaining agreement. We will enforce the Board's decision on the ground that the collective bargaining agreement did not give the employer the right to impose the change in procedure unilaterally. We thus adopt the ALJ's contractual approach rather than the Board's conclusion that managerial discretion was no longer effective. We specifically decline to rule on that issue.
 
 
 22
 We disagree with the employer's contention that the changes are de minimis. Instead, we believe that the matters are of substantial concern to the employees. This is a factual matter supported by substantial evidence in the record. We will enforce the Board's order on this charge.
 
 4. Changes in Location of Breaks
 
 23
 For a number of years, electricians and maintenance workers ate lunch and took their breaks in the plant's electrical shop. Some of them took their lunch breaks outside the plant. Other maintenance workers ate in a designated lunchroom in the main building about 100 feet away from the electrical shop.
 
 
 24
 In January 1991, the employer directed that employees no longer take breaks or eat lunch in the electrical shop. This order was prompted by safety concerns, including the hazard presented by a toxic substance used in the electrical shop and the tendency of employees to discard their hard hats during lunch. The employer had become aware that federal safety regulations prohibited it from allowing employees to consume or store food or beverages in such an environment.
 
 
 25
 The ALJ decided that, in light of the safety concerns, the employer could lawfully prohibit the use of the electrical shop for lunch breaks without consulting the Union. In addition, the ALJ found that the employer directed the electricians and maintenance workers who formerly ate in the shop, as well as those who had eaten elsewhere, to go to the company lunchroom thereafter. Although the employer maintained that employees remained free to take their breaks off premises, the ALJ found that the employer had made a substantial change in working conditions by requiring the employees to use the lunchroom. The ALJ determined that the employer failed to give the Union the opportunity to bargain about the effects of its policy banning the use of the electrical shop for lunch and breaks and thus committed an unfair labor practice.
 
 
 26
 The Union neither requested bargaining over the effects of banning lunches and breaks in the shop nor requiring electricians and maintenance workers to eat in the lunchroom. At oral argument, counsel for the Board conceded that point but argued that the request would have been futile. We find no support in the record for that position.
 
 
 27
 In Oklahoma Fixture, 79 F.3d at 1030, we discussed the requirements of effects bargaining. We pointed out that timely notice to the Union is generally required so that bargaining may take place before a new policy is instituted. However, in some situations, such as an emergency, no notice need be given. Significantly, we stated that implementation of a policy does not preclude effects bargaining, nor does the filing of an unfair labor practice charge by the Union relieve it of its obligation to request bargaining. Id. "[A] union cannot simply ignore its responsibility to initiate bargaining over subjects of concern and thereafter accuse the employer of violating its statutory duty to bargain." Id., quoting NLRB v. Island Typographers, Inc., 705 F.2d 44, 51 (2d Cir.1983).
 
 
 28
 We do not consider this case one in which advance notice to the Union was required. Allowing the hazard from a toxic substance to continue while bargaining took place would not protect the health interests of the employees nor the responsibility of the employer to comply promptly with the applicable federal safety regulations. Moreover, the presence of the electricians and maintenance workers at one location at lunch time facilitated assignments to other tasks after the break. In these circumstances, by failing to request bargaining on the effects of the justifiable ban on eating lunch in the electrical shop and the directive to use the lunchroom, the Union forfeited its right to contest the change.
 
 
 29
 Accordingly, the employer did not commit an unfair labor practice by changing the location where the employees were to spend their lunch breaks. As to that matter, we will decline to enforce the Board's order.
 
 5. Premium Pay
 
 30
 Sixteen bargaining unit employees worked on all three shifts on a rotating basis and are referred to as "shift employees." We must decide whether the employer's belated action in placing both "shift" and regular employees on the same footing with respect to overtime and premium pay was proper.
 
 
 31
 Prior to November 1990, the employer apparently had established a practice under which shift employees, who worked a five-day work week that included Sunday, would be paid time-and-a-half for Sunday (up to 8 hours), and time-and-a-half for any work performed on an unscheduled day if they were called in to work on that day.
 
 
 32
 The details of the differentiation in overtime and premium pay between shift employees and regular employers under the terms of the expired contract are unclear, but it seems apparent that the employer intended to change the practice. In its implementation letter of November 12, 1990, the employer announced the following new schedule for overtime and premium pay:
 
 
 33
 "Eliminate current premium and overtime provisions and substitute as follows:
 
 O.T. --- 1.5x over 8 or over 40
 Sunday --- 1.5x up to 8; 2x over 8
 Holiday --- 1.5x up to 8; 2x over 8
 
 34
 Max --- 2x for all cases except first 8 hours of
 
 
 35
 holiday work which would be 2.5x including
 
 
 36
 holiday pay."
 
 
 37
 Substantial evidence elicited at the hearing before the ALJ suggests that the implementation letter was intended to eliminate the credit towards the 40-hour plateau that shift workers were receiving for time worked on Sundays.
 
 
 38
 In June 1992, a regular employee complained that certain shift workers who had been scheduled to work on Sunday had been receiving time-and-a-half pay for work performed on unscheduled days, but that similarly situated regular employees received only straight time pay for work performed on unscheduled days. The employer then eliminated the disparity by directing that shift employees be paid overtime under the same standards as regular employees.
 
 
 39
 The ALJ found that, as of June 1992, the overtime rates paid to the sixteen shift employees had become "a term and condition of employment for the shift employees, apart from either the 1987-1990 contract, or the implementation of its last offer in 1990." Consequently, he held that the employer could not unilaterally alter the overtime payments to shift employees.
 
 
 40
 The employer contends that the practice of providing overtime compensation for unscheduled days to shift employees was inadvertent, contrary to the terms of the implementation letter, and thus was permissibly reversed without bargaining. The Union argues that the employer's lengthy delay in implementing that term of its post-impasse letter prevents abrogation of the more generous practice.
 
 
 41
 The implementation letter specifies one, and only one, method of computing overtime and premium pay. There is no provision granting additional benefits to shift employees and there is no evidence that any such offer was ever made to the Union. Although an employer may implement unilateral changes after the parties have reached an impasse, those changes may be no more favorable than those offered to the Union before the declaration of impasse. Thus, an employer may not unilaterally grant a wage increase that is greater than that offered to the Union during negotiations. NLRB v. Katz, 369 U.S. 736, 744 (1962). Just as after an impasse an employer may not withdraw employee benefits, Local 155, Int'l Molders & Allied Workers Union v. NLRB, 442 F.2d 742, 746 (D.C.Cir.1971), it may it not increase previous offers to the Union, see generally 11 Warren Employment Coordinator p LR-26,754 (1996)
 
 
 42
 The employer acted in violation of this rule for approximately nineteen months before it reversed course. The practice of paying shift employees more than that to which they were entitled under the implementation letter could not have become a term of employment--because those payments were themselves a violation of the Act. See Florida Steel Corp. v. NLRB, 601 F.2d 125, 130 (4th Cir.1979) (unintentional unilateral change violates the Act). Moreover, it would defy logic to hold that a party's action in ending an unfair labor practice is itself an unfair labor practice. We therefore will not enforce that portion of the Board's order requiring the employer to deviate from its post-impasse implementation order.[1]
 
 
 43
 In sum, we enter the following Order and Judgment:
 
 
 44
 1. On the charge that the employer committed an unfair labor practice by changing the employees' break schedule during a 1992 plant shutdown, the employer's petition for review is DENIED and the request for enforcement is GRANTED;
 
 
 45
 2. On the charge that the employer committed an unfair labor practice by changing the employees' shift starting times on May 25, 1992, and the related charge that the employer committed an unfair labor practice by dealing directly with employees, the employer's petition for review is DENIED and the request for enforcement is GRANTED;
 
 
 46
 3. On the charge that the employer committed an unfair labor practice by changing its vacation policy without first bargaining with the union prior to the change, the employer's petition for review is DENIED and the request for enforcement is GRANTED;
 
 
 47
 4. On the charge that the employer committed an unfair labor practice by changing the location of lunch breaks, the employer's petition for review is GRANTED and the request for enforcement is DENIED;
 
 
 48
 5. On the charge that the employer committed an unfair labor practice by belatedly placing "shift" and regular employees on the same footing with respect to overtime and premium pay, the employer's petition for review is GRANTED and the request for enforcement is DENIED.
 
 
 
 **
 The Honorable Joseph F. Weis, Jr., United States Senior Circuit Judge for the United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 *
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of Tenth Cir. R. 36.3
 
 
 [1]
 The employer contends that the matter of premium pay had previously been ruled upon by the District Director by letter of June 1991. We disagree. The letter appears to address a separate matter than that presently before us and we do not find it controlling