# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

**No. 23-1301**

**September Term, 2024**

FILED ON: DECEMBER 13, 2024

METROHEALTH, INC., D/B/A HOSPITAL METROPOLITANO RIO PIEDRAS,
PETITIONER/CROSS-RESPONDENT

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT/CROSS-PETITIONER

Consolidated with 23-1331

On Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board

Before: HENDERSON and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*

## J U D G M E N T

We considered this case on the record and the briefs filed by the parties. *See* Fed. R. App. P. 34(a)(2); D.C. Cir. R. 34(j). We fully considered the issues and determined that a published opinion is unnecessary. *See* D.C. Cir. R. 36(d). For the reasons stated below, it is

**ORDERED** and **ADJUDGED** that the petition for review is **DENIED** and the cross-application for enforcement is **GRANTED**.

## I

Metrohealth, Inc. (Metrohealth) operates a hospital in San Juan, Puerto Rico. Until being laid off in 2021, union-represented employees in the Environmental Control Department (ECD) cleaned the facility for over a decade. Each of the evaluated ECF employees earned "excellent" annual appraisal scores in the two years before being laid off. José Talavera has been Metrohealth's Executive Director since January 2019. In that role, he directly supervised the ECD. In January 2018, a report by the Puerto Rico Department of Health found deficiencies in infection control at the hospital. According to his testimony, in 2019 Talavera found that the ECD's performance fell short of infection control standards but he did not put this in writing. Non-

1

compliance with infection control standards could result in the hospital losing accreditation and potentially going out of business. At some point in late 2020 or early 2021, Metrohealth began using an outside contractor to cover some cleaning shifts because the ECD team was short-staffed. From late February to early May 2021, Talavera received several internal reports of deficiencies in the ECD's cleaning standards. In March 2021, Metrohealth began requesting proposals to subcontract the ECD's work.

On May 28, 2021, Metrohealth notified the union of its "intention to subcontract" the ECD's work and lay off ECD employees, offering "to negotiate . . . the effects" of that decision. J.A. 276–77. Metrohealth stated that the decision was "in no way related to labor costs" but was instead due to difficulties filling vacancies and "deficiencies" in the ECD's services. *Id.* The union objected the next business day, requesting information about the alleged deficiencies and asking Metrohealth to postpone its decision until the parties could bargain. On June 7, Metrohealth responded to the union's requests for information and stated that documents relating to performance deficiencies would be made available for in-person inspection by earlier arrangement. Three days later, the union official responsible for bargaining with the hospital stated that he would be on vacation from June 15–29 and requested reasonable dates for reviewing the performance documents upon his return, bargaining dates after analysis of that documentation and a postponement of the decision to subcontract until after bargaining.

On June 14, Metrohealth signed a contract with a subcontractor to begin work on June 25. On June 17, Metrohealth replied to the union and refused to delay subcontracting because the ECD's performance had "escalated into an emergency warranting an immediate and drastic change." J.A. 459. Metrohealth also repeated its willingness to bargain on the effects of the subcontracting. On June 22, the union asked for confirmation on whether the decision to subcontract had been made, renewed its objection to subcontracting, requested dates to review performance deficiency documentation and asked for bargaining dates after that review. That day, Metrohealth replied to confirm that the subcontracting decision had already been made. On June 24, Metrohealth laid off the eleven ECD employees and the next day the subcontractor began performing the ECD's work. Metrohealth's functions otherwise remained the same.

The union filed charges with the National Labor Relations Board (Board) alleging that Metrohealth unlawfully subcontracted the ECD's work, and the Board issued a complaint on that basis. An Administrative Law Judge (ALJ) found that Metrohealth violated the National Labor Relations Act (the Act) by subcontracting the work and laying off ECD employees without giving the union an adequate opportunity to bargain over that decision and its effects. The ALJ discredited Talavera's testimony about the reasons for subcontracting. The Board agreed with the ALJ, finding that Metrohealth violated the Act by failing to bargain over its decision to subcontract. *Metrohealth, Inc.*, 372 N.L.R.B. No. 149, at *1 (Sept. 30, 2023).

## II

The Board had jurisdiction under section 10(a) of the Act, 29 U.S.C. § 160(a), and we have jurisdiction under sections 10(e) and (f), *id.* §§ 160(e), (f).

We "review Board decisions with a 'very high degree of deference.'" *Hosp. de la Concepción v. NLRB*, 106 F.4th 69, 76 (D.C. Cir. 2024) (quoting *Ozburn-Hessey Logistics, LLC v. NLRB*, 833 F.3d 210, 217 (D.C. Cir. 2016)). The Board's findings of fact are conclusive if they are supported by substantial evidence on the record as a whole. 29 U.S.C. § 160(e). Substantial

2

evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. of N.Y.. v. NLRB*, 305 U.S. 197, 229 (1938)). We accept the Board's adoption of an ALJ's credibility determinations unless they are "hopelessly incredible, self-contradictory, or patently unsupportable." *Wayneview Care Ctr. v. NLRB*, 664 F.3d 341, 349 (D.C. Cir. 2011) (quoting *United Food & Com. Workers Union Loc. 204 v. NLRB*, 447 F.3d 821, 824 (D.C. Cir. 2006)). The Board's construction of the Act "is afforded 'considerable deference' and upheld so long as it is 'reasonably defensible.'" *Bob's Tire Co. v. NLRB*, 980 F.3d 147, 153 (D.C. Cir. 2020) (quoting *Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 307 (D.C. Cir. 2003)). We review the Board's interpretation of a collective bargaining agreement (CBA) de novo but defer to those findings of fact necessary to interpret the contract, including evidence of party intent drawn from the parties' bargaining history. *Pac. Mar. Ass'n v. NLRB*, 967 F.3d 878, 884–85 (D.C. Cir. 2020).

An employer commits an unfair labor practice in violation of section 8(a)(5) of the Act by "refus[ing] to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). The duty to bargain requires an employer to "confer in good faith with respect to wages, hours, and other terms and conditions." *Id.* § 158(d). "An employer thus violates section 8(a)(5) by unilaterally changing an existing term or condition of employment without first bargaining to impasse." *Regal Cinemas*, 317 F.3d at 309 (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991)). "An employer who violates section 8(a)(5) also derivatively violates section 8(a)(1), which makes it unlawful for an employer 'to interfere with, restrain, or coerce employees in the exercise of' their statutory labor rights." *Id.* at 309 n.5 (quoting 29 U.S.C. § 158(a)(1)). Hiring independent contractors to perform work previously done by union employees under similar conditions of employment falls within the terms and conditions of employment subject to mandatory bargaining. *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 213, 215 (1964). Certain decisions—involving a change in the "scope and direction of the enterprise" akin to deciding "whether to be in business at all"—have a "direct impact on employment" but "focus only [on] the economic profitability of the [business]" and require mandatory bargaining "only if the benefit, for labor-management relations and the collective-bargaining process, outweighs the burden placed on the conduct of the business." *First Nat'l Maint. Corp. v. NLRB*, 452 U.S. 666, 677, 679 (1981). Under this balancing test, the decision to close part of a business for purely economic reasons is not subject to mandatory bargaining. *Id.* at 686.

## A

"[T]he type of 'contracting out' involved in this case—the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment—is a statutory subject of collective bargaining." *Fibreboard*, 379 U.S. at 215; *see also Regal Cinemas*, 317 F.3d at 312 (transfer of work from projectionists to managers under similar conditions of employment was mandatory subject of bargaining).

Nevertheless, Metrohealth argues that it subcontracted the ECD's work to protect its accreditation, falling within the "core entrepreneurial concerns" exception to mandatory bargaining laid out in *Oklahoma Fixture Co.*, 314 N.L.R.B. 958, 960 (1994), *enf't denied*, 79 F.3d 1030 (10th Cir. 1996), following *First National*. In *Oklahoma Fixture*, a manufacturer of department store display cases brought electrical work in-house for fifteen months before deciding to revert to a subcontracting model. *Id.* at 958–59. The Board highlighted that the ALJ credited

employer testimony that the company decided to subcontract the electrical work because it was concerned about legal liability and the risk of losing its largest customer—accounting for 95 per cent of sales—in the event of faulty wiring. *Id.* As a result, the Board determined that labor costs were not a factor in the decision, which instead "involved considerations of corporate strategy fundamental to preservation of the enterprise." *Id.* at 960.

In contrast to *Oklahoma Fixture*, here the ALJ discredited Talavera's claim that Metrohealth decided to subcontract because the ECD's deficient performance threatened loss of accreditation. The ALJ highlighted that Talavera put nothing in writing and failed to act for years despite the allegedly serious risk to the hospital. Moreover, Metrohealth's failure to produce relevant reports made it impossible to determine if the 2018 inspection deficiencies had been corrected before 2021, the internal reports identifying deficiencies coincidentally dated from the period when Talavera began looking for subcontractors and the ECD employees continued to receive excellent performance reviews. The ALJ's credibility determination was thus not "hopelessly incredible, self-contradictory, or patently unsupportable." *Wayneview Care Ctr.*, 664 F.3d at 349.

Likewise, the Board found that nothing in the record suggested that alleged deficiencies "were sufficiently severe or pervasive to place [Metrohealth's] accreditation at risk if not immediately corrected." J.A. 1184 n.7; *see also id.* at 1184 n.8 (finding that even if deficiencies reached the point of exigency in March 2021, Metrohealth could have notified the union at that time and bargained for another six or seven weeks). The Board's factual findings are supported by substantial evidence.

**B**

Metrohealth contends that several sections across a number of articles in the CBA covered the decision to subcontract, removing that decision from the scope of mandatory bargaining. That is incorrect.

"The union may exercise its right to bargain about a particular subject by negotiating for a provision in a collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993) (quoting *Loc. Union No. 47, IBEW v. NLRB*, 927 F.2d 635, 640 (D.C. Cir. 1991)). "Thus, pursuant to the contract coverage doctrine, an employer is 'free to make unilateral changes . . . without running afoul of the Act' when those changes are 'covered by the collective bargaining agreement.'" *Wilkes-Barre Hosp. Co. v. NLRB*, 857 F.3d 364, 376 (D.C. Cir. 2017) (quoting *Enter. Leasing Co. of Fla. v. NLRB*, 831 F.3d 534, 547 (D.C. Cir. 2016)). "To conclude that a CBA covers the challenged unilateral conduct, the conduct must fall 'within the compass or scope of contract language granting the employer the right to act unilaterally.'" *Pac. Mar.*, 967 F.3d at 891 (quoting *MV Transp., Inc.*, 368 N.L.R.B. No. 66, at *17 (Sept. 10, 2019)). Although the CBA need not "specifically mention" the action at issue, an employer may not unilaterally act simply because the relevant terms and conditions of employment "fall within a broad subject area that the parties' Agreement had addressed in other respects." *Id.* (citing *Wilkes-Barre Hosp.*, 857 F.3d at 377). "To avail itself of the defense, [the employer] must show that some provision in the CBA[] affirmatively permits it to unilaterally [take the challenged action]; the mere absence of a provision expressly prohibiting such action is insufficient." *Hosp. de la Concepción*, 106 F.4th at 79.

Most relevantly, section 11.2 permits Metrohealth to "contract for assignment" and to

4

"contract per diem personnel, or independent contractor[s]." J.A. 208. The clause giving Metrohealth authority to "contract for assignment" goes on to state that Metrohealth may "transfer, promote, train, suspend, discharge and discipline employees for a just cause." *Id.* In context, to contract for assignment simply means to hire. *See Cintas Corp. v. NLRB*, 482 F.3d 463, 471 (D.C. Cir. 2007) (Henderson, J., concurring) ("Under the doctrine of *noscitur a sociis*, [a term] must be read in light of its associated references."). Similarly, and as the Board found, the right to hire independent contractors—read next to the right to hire per diem personnel—means the right "to augment [the] workforce with contractors," not "to lay off the ECD employees and subcontract their work." J.A. 1186.

Metrohealth's references to sections of the CBA pertaining to layoffs and downsizing are similarly unavailing. Section 10.2—governing layoffs—provides that Metrohealth "shall determine the time of discharges, the number of employees to be discharged, and the departments and classifications to be affected" and also provides the order in which "layoffs shall take place" if "downsizing" is required for reasons authorized under Puerto Rican law. J.A. 204–05. However, there was no downsizing here. Instead, Metrohealth "merely transferred to [subcontractors] work that was previously done by" union employees. *Regal Cinemas*, 317 F.3d at 313. Moreover, the context of section 10.2—part of Article X, which addresses "seniority"—indicates that it is intended to address how seniority factors into layoffs and other personnel decisions, not to authorize subcontracting department work. J.A. 204–07. Section 18.1 prohibits laying off employees covered by the CBA "except for a justified cause" under Puerto Rican law. J.A. 228. As the Board observed, "there is no basis for interpreting this limitation on [Metrohealth]'s ability to lay off employees as an affirmative grant of authority to subcontract." J.A. 1186. Moreover, none of the just cause reasons Metrohealth relies on applies here. This was not a "partial closing of the operations of the establishment," a "[t]echnological or reorganization change[]," a "change[] in the services rendered to the public," or "[d]ownsizing made necessary by a reduction in . . . production, sales, or profits." P.R. LAWS ANN. tit. 29, § 185b. Although section 33.9 authorizes Metrohealth to "eliminate [its] operations or part of them," J.A. 260, Metrohealth did not eliminate any operations, it simply transferred the work from union employees to independent contractors.

General management provisions do not authorize Metrohealth's action either. Section 11.1 provides that Metrohealth "retains, solely and exclusively all its rights . . . to administer the business, as these rights existed before signing th[e] Agreement." J.A. 208. However, once employees voted to unionize, Metrohealth had a duty to bargain before changing terms and conditions of employment. *See Fugazy Cont'l Corp. v. NLRB*, 725 F.2d 1416, 1421 (D.C. Cir. 1984) (enforcing a pre-certification duty to bargain before making unilateral changes to the terms and conditions of union employment). Section 11.2 authorizes Metrohealth to take "any other required measure determined by [Metrohealth] for its orderly, efficient and profitable operation." J.A. 209. And section 34.5 provides that "[n]one of the provisions of th[e] Agreement can be construed to . . . deny[] [Metrohealth] the right to do everything that is not forbidden by the contract" and that Metrohealth "policies and practices, including the external work contract . . . not [] expressly prohibited or limited in th[e] Agreement" will not be the subject of a grievance process. J.A. 266. As the Board observed, Metrohealth's overbroad interpretation of these clauses "would equally permit the subcontracting of the work of the entire unit." J.A. 1186 n.12. "Absent [] affirmative evidence, we are loath to conclude that a union would knowingly agree to a clause that would effectively permit the employer to unilaterally extinguish the bargaining unit altogether." *Regal Cinemas*, 317 F.3d at 313.

5

Finally, we also defer to the Board on findings of fact necessary to interpret the contract, including evidence of party intent from the parties' bargaining history. *Pac. Mar.*, 967 F.3d at 884–85. Here, the Board found that there was no evidence from the parties' negotiations to support Metrohealth's interpretation and highlighted that Metrohealth asserted to the union that the subcontracting decision had nothing to do with labor costs, suggesting that it viewed the decision as excluded from mandatory bargaining under *First National* rather than the contract coverage doctrine. These factual findings are supported by substantial evidence because Metrohealth does not offer evidence to the contrary and the Board's construction of the Act is reasonably defensible.

## C

Metrohealth argues that the union failed to act and tried to unreasonably delay the subcontracting implementation, ignoring Metrohealth's proposals to bargain. A union must act with due diligence in requesting bargaining to avoid waiving its claims under the Act, but it does not need to go through the motions of requesting bargaining if it is clear the employer has made its decision and will not negotiate. *Regal Cinemas*, 317 F.3d at 314. "Notice of a fait accompli is simply not the sort of timely notice upon which the waiver defense is predicated." *Id.* (cleaned up) (quoting *Int'l Ladies' Garment Workers Union, AFL-CIO v. NLRB*, 463 F.2d 907, 919 (D.C. Cir. 1972)). Here, Metrohealth's May 28 letter informed the union of Metrohealth's "intention to subcontract" and offered to bargain only over the effects, not the decision. J.A. 276–77. Therefore, the union was not obligated to go through the motions of requesting bargaining. *See Regal Cinemas*, 317 F.3d at 314 (affirming Board finding of no waiver where employer "simply informed" union of its decision). In any event, the union did request bargaining. The next business day, it asked for documents supporting the reason given for subcontracting and for a postponement of the decision until the parties could negotiate. Metrohealth took a week to reply, and just a week later inked a contract with the subcontractor. Therefore, the Board's adoption of the ALJ's rejection of the union-delay defense is supported by substantial evidence.

\* \* \*

For the foregoing reasons, we deny Metrohealth's petition for review and grant the Board's cross-application for enforcement.

This disposition is unpublished. *See* D.C. Cir. R. 36(d). We direct the Clerk to withhold this mandate until seven days after the resolution of a timely petition for panel or en banc rehearing. *See* Fed. R. App. P. 41(b); D.C. Cir. R. 41(a)(1).

### Per Curiam

**FOR THE COURT:**
Mark J. Langer, Clerk

BY:    /s/
Daniel J. Reidy
Deputy Clerk