SOUTHERN MARYLAND HOSPITAL
CENTER, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

Office and Professional Employees
International Union, Local 2,
Intervenor for Respondent.

No. 85–2042.

United States Court of Appeals,
Fourth Circuit.

Argued May 7, 1986.
Decided Sept. 18, 1986.

Warren M. Davison (Leslie Robert Stell-man, Littler, Mendelson, Fastiff & Tichy, on brief), for petitioner.

Nancy B. Hunt, N.L.R.B. and Joseph E. Finley, Gen. Counsel, Office and Profes-sional Employees Intern. Union (Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Dep-uty Associate Gen. Counsel, Peter Winkler, on brief), for respondent.

Before WIDENER, HALL, and CHAP-MAN, Circuit Judges.

CHAPMAN, Circuit Judge:

This case comes before us upon the peti-tion of Southern Maryland Hospital Center to review and set aside an order of the National Labor Relations Board (NLRB or Board). The Board has filed a cross-appli-cation for enforcement of its order. The Office and Professional Employees Interna-tional Union, Local No. 2 (OPEIU or the union), the charging party before the Board, has intervened in support of en-forcement.

The petitioner is a full-service general hospital located in Clinton, Maryland. The hospital opened in 1977 under the direct control of its Chief Executive Officer and principal stockholder, Dr. Francis Chiara-monte. It employed approximately 1300 persons during the time period relevant to this suit. In the spring of 1981, five labor organizations, including intervenor OPEIU, began what would become a thirteen-month organizational effort at the hospital. The effort culminated on June 11, 1982, with a representation election in which no labor organization won a majority. This case arises from union charges filed January 25, 1982, claiming that the hospital committed a long list of unfair labor practices during the organizational campaign in violation of § 8(a)(1) and (3) of the National Labor Re-lations Act, as amended, 29 U.S.C. § 158(a)(1), (3) (1982).

The administrative law judge found nu-merous violations of § 8(a)(1) and two viola-tions of § 8(a)(1) and (3). The Board af-firmed, in substance, all but one of the ALJ's findings and conclusions and issued a remedial order.[1] *Southern Maryland*

---

1. In particular, the Board found that: the hospi-tal violated sections 8(a)(3) and (1) of the Act by

failing to grant its approximately 1,300 employ-ees a year-end bonus in 1981; the hospital vio-

*Hospital Center and Office and Professional Employees International Union, Local No. 2, AFL–CIO,* 276 N.L.R.B. 153 (1985). In reviewing these violations pursuant to 29 U.S.C. § 160(e), (f), we are mindful that we must sustain them and grant enforcement of the order if the findings are supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951); *NLRB v. Kiawah Island Co.,* 650 F.2d 485, 489 (4th Cir.1981). We find that there is substantial evidence in the record as to most of the § 8(a)(1) violations and grant enforcement on that portion of the order. We deny enforcement as to the two claimed § 8(a)(1) and (3) violations and three other claimed § 8(a)(1) violations.

I

## THE BONUS ISSUE

The most significant issue arises from the Board's finding that the hospital violated § 8(a)(1) and (3) of the Act by "withholding" a year-end bonus in 1981. The Board found that even though the hospital had given just one such bonus in the past, the evidence indicated that the hospital intended to give a bonus in 1981 but chose not to out of anti-union animus. The Board adopted the ALJ's recommended remedy, requiring the hospital to pay its 1981 employees a bonus similar in amount to the $215,000 bonus of 1980, along with interest.

The hospital contends that the 1980 bonus was a one-time gift which it had no intention of repeating in 1981. In particular, Dr. Chiaramonte testified that the 1980 bonus was a spur-of-the-moment gift which he authorized because the cash was on hand and because he wanted to repay the

hospital employees for their support in a personal crisis—his sixteen year-old daughter had been fatally injured in an automobile accident and had received care at the hospital. The hospital further contends that its yearly contributions to an employee pension plan illustrate that the hospital preferred this system of employee recognition over a bonus system. The hospital had contributed $195,000 to the plan in 1980 and $175,000 in 1981. Finally, the hospital contends that even if it had intended to give a 1981 bonus, cash flow problems at the time prevented it from paying out funds to the employees.

The Board found, contrary to the hospital's contention, that the 1980 bonus was not a one-time "gift", that the hospital intended to give a bonus in 1981, that the bonus was withheld out of anti-union animus, and that the cash flow problems put forth as a separate business justification for the hospital's inability to grant a bonus were pretextual. The Board concluded that the withholding of the bonus was an attempt to coerce and restrain employees into not supporting the union and therefore violative of § 8(a)(1) and (3). *See NLRB v. Tamper, Inc.,* 522 F.2d 781, 785 (4th Cir. 1975).

A.

There is general agreement that when an employer by promises or by a continuous course of conduct has made a particular benefit part of the established wage or compensation system, then the withholding of that benefit during an organizational campaign raises the inference of improper employer conduct. *NLRB v. Dothan Eagle, Inc.,* 434 F.2d 93, 98 (5th Cir.1970); *Gossen Company v. NLRB,* 719 F.2d 1354, 1356–57 (7th Cir.1983); *Plasticrafts, Inc. v.*

lated section 8(a)(1) of the Act by various acts and conduct on the part of certain of its managers and supervisors during the period November 1981 through March 1982; the hospital violated section 8(a)(1) of the Act by instituting an "Employee of the Month" award in order to discourage employees' support for the union; the hospital violated section 8(a)(1) of the Act by soliciting grievances from employees and remedying those grievances in order to discourage their support for the union; the hospital violated section 8(a)(1) of the Act by restricting access of employees to union organizers in the hospital cafeteria; and the hospital violated sections 8(a)(3) and (1) of the Act by issuing disciplinary warnings to former employee Patricia Vass on September 30 and December 23, 1981.

*NLRB*, 586 F.2d 185, 188–89 (10th Cir. 1978); *Free-Flow Packaging Corp. v. NLRB*, 566 F.2d 1124, 1129 (9th Cir.1978). An employer can avoid the finding of a violation in such a case only if he can separately justify his action with a legitimate business purpose. *NLRB v. Otis Hospital*, 545 F.2d 252, 256 (1st Cir.1976).

On the other hand, when there is no "established practice" of granting benefits, the General Counsel must show that the employers' withholding of particular benefits was motivated by anti-union sentiment to prove a violation of the Act. *Plasticrafts*, 586 F.2d at 188–89. This is so because "in such an ambiguous situation the employee is unlikely to draw a predictable conclusion [that the employer seeks to influence the election] from the employer's course of conduct." *Id; see also Gossen*, 719 F.2d at 1356–58; *Free-Flow Packaging*, 566 F.2d at 1129–30.

### B.

The initial determination to be made is whether an employer by promises or by a continuous course of conduct has made a particular benefit part of its "established practice." The focus in such a situation should be upon the employer, who is confronted with the dilemma of deciding whether his past promises or grants of benefits have created a clear *status quo* that he must maintain during the pre-election period. *See Free-Flow Packaging*, 566 F.2d at 1129. The standard then is whether it would be clearly apparent to an objectively reasonable employer that his grant or denial of a benefit, at the time the action is taken, conforms to the *status quo. Plasticrafts*, 586 F.2d at 188.

■ Upon review of the record in this case, we find no substantial evidence to support a conclusion that Southern Maryland Hospital Center had established a practice, through prior promises or conduct, of granting an annual year-end bonus. Turning first to the hospital's past conduct, we refuse to give any credence to the proposition that a one-time gift such as that given by Dr. Chiaramonte in 1980, standing alone, could in any way establish a policy or practice of yearly bonuses. Christmas bonuses are generally discretionary in nature and must be given over a significant period of time before they can be considered part of the *status quo. See, e.g., NLRB v. McCann Steel Co.*, 448 F.2d 277, 279 (6th Cir.1971); *Beacon Journal Publishing Co. v. NLRB*, 401 F.2d 366, 367 (6th Cir.1968).

The Board found, however, that several publications and conversations between management and employees during 1981 indicate that the hospital intended to give a Christmas bonus that year. Specifically, the Board relies upon a recruiting advertisement for nurses in the *Washington Post*, two recruiting pamphlets listing hospital employee benefits, and a half-dozen isolated conversations between various members of the hospital management, low-level supervisory staff, and employees. Assuming, as we must, that this evidence is credible and true, we nonetheless hold that it is insufficient as a matter of law to prove that the hospital made the kind of promises that would elevate the year-end bonus in this case to the status of an established practice. At best, the evidence shows that an ambiguity existed as to whether a year-end bonus should be given in 1981.

■ The Board found that the *Washington Post* ad contained language indicating that nurses were to receive a year-end bonus as an employment benefit. While this is one interpretation, the language of the ad is far from clear and could just as easily be read to refer to another benefit which allowed nurses to take a "bonus" day off if they did not take their five annual sick leave days.[2]

---

2. The advertisement read:
   Excellent working conditions. Benefits include: Fully Paid Life, Disability; Hospitalization, Dental Insurance; vacation; holidays; sick leave & bonus.

The Board's interpretation of this advertisement is not a finding of fact to which we must defer, as courts may engage in legal interpretation of the written word. *NLRB v. Big Three Industrial*

The two recruiting pamphlets relied upon by the Board both contained a list of employee benefits, one of which was a "year-end bonus." There is evidence that the first of the two pamphlets was posted on hospital bulletin boards and distributed to some employees; however, the explicit purpose of this flyer was to persuade some of approximately 100 former nurses to return to work for the hospital. There is evidence that the flyer produced at most seven inquiries. In any event, the employee who drafted the pamphlet testified without contradiction that she published the documents without Dr. Chiaramonte's approval or authorization. Upon receiving a copy of the first pamphlet, Dr. Chiaramonte reprimanded the employee, explaining that three of the benefits listed, including the year-end bonus, were nonexistent. The second pamphlet, a more polished brochure to be used for recruitment and orientation, was edited before it was released, and there is no evidence that any employee saw the pamphlet in its uncorrected form.

The conversations and statements relied upon by the Board are similarly isolated incidents not amounting to the type of authoritative and generally disseminated promises necessary to create an established practice. Most of the conversations occurred during December 1981, a month in which rumors concerning a possible year-end bonus were widespread.[3] The conversations generally consisted of an individual or small group of employees inquiring of supervisors or low-level managers whether there would be a bonus in 1981. While the evidence concerning Comptroller Wesley Melvin indicates that he seemed to think that there might be a bonus, it also plainly shows that he was not the decision maker and that the final decision on whether to give a bonus had not been made.

Meanwhile, there is no evidence that the ultimate decision maker, Dr. Chiaramonte, had at any time given any indication that

the one-time gift of 1980 was to be continued as a year-end bonus in 1981 and beyond. The doctor made no statements, and more importantly, there was never an authoritative, general announcement of any kind stating that the 1300 hospital employees would receive a 1981 Christmas bonus. This is not a case such as *NLRB v. Otis Hospital*, 545 F.2d 252 (1st Cir.1976). In that case, the Hospital Administrator issued a general announcement, posted on all bulletin boards, that employees would receive a cost-of-living salary increase. When the union began its organizational drive, the administrator refused to implement the wage increase. The court upheld the Board's finding of a § 8(a)(1) and (3) violation reasoning, "A clear impression was publicly conveyed to all employees that a wage increase was imminent, and an employee would scarcely expect this employer to renege in such circumstances." 545 F.2d at 256. The hospital's actions in the present case could not have conveyed such a "clear impression" to anyone and, at most, evidenced that the bonus issue was mired in ambiguity.

Based upon this record, we find that it would not have been clearly apparent to a reasonable employer in the hospital's situation that the Christmas bonus was such an established employee benefit that its withholding would raise an inference of improper conduct on the part of the hospital.

### C.

■ Since there was no established practice in this case, the Board may find a violation of the Act only if it is affirmatively shown that the hospital was motivated by anti-union sentiment in withholding the benefit. *Plasticrafts, supra; Gossen, supra; Free-Flow Packaging, supra.* The Board found anti-union animus based upon (1) a statement by an assistant maintenance supervisor to an employee; (2) a

---

*Gas & Equipment Co.,* 441 F.2d 774, 777 (5th Cir.1971).

**3.** The union itself was a leading contributor of grist to the rumor-generating mill. The December 10, 1981 edition of the OPEIU newsletter,

*Solid Rock,* contained the passage, "Rumor has it that Dr. C is not sure if he can pay Christmas Bonuses again this year or not due to 'union activity'."

statement by Comptroller Melvin to one employee, overheard by a second employee; and (3) Dr. Chiaramonte's general anti-union animus and his *silence* concerning the bonus. We hold that this is insufficient evidence to show the type of coercive and manipulative motivation necessary for a violation of the Act.

The statement by Assistant Operations Director Morris to employee Kearney consisted of a cryptic response to a confidential question.[4] According to Kearny, Morris acknowledged that the reason no bonus had been given was because of "union activities at the shop." This isolated comment made by a low-echelon supervisor during a confidential conversation with an individual employee can hardly be classified as the type of coercive statement proving the anti-union animus of the employer. *See NLRB v. Big Three Industrial Gas & Equipment Co.,* 579 F.2d 304, 310–11 (5th Cir.1978); *Federal-Mogul Corp. v. NLRB,* 566 F.2d 1245, 1257 (5th Cir.1978).

The second statement was made by Comptroller Melvin in response to employee Diggs' question about the bonus. Employee Westfield testified that she overheard Melvin tell Diggs that there would be no Christmas bonus because of the union, but that "we may receive one after the union election." Melvin denied making the statement, but the ALJ and Board chose to credit Westfield's testimony. Again, we are struck by the casual and isolated nature of this particular conversation. Melvin was informally answering a question about the bonus from an individual employee, and his response reached the ears of at most three employees. We are also uncertain that the substance of Melvin's explanation was of such a coercive nature to constitute an unfair labor practice. *See Gossen,* 719 F.2d at 1356–58; *see also NLRB v. Dorn's Transportation Co.,* 405 F.2d 706, 715 (2d Cir.1969) ("This is not a situation where the employer has by public announcement specifically advised the employees that the union is causing them to lose a [benefit] they would otherwise have received.")

Finally, the ALJ and Board found that Dr. Chiaramonte's total silence on the bonus matter "sent a message loud and clear [to the employees] that any benefits they might receive would be bestowed by his fiat and not wrung from him by outside coercion." There is no factual basis for this conclusion. While it is true that Dr. Chiaramonte generally showed no love for the unions in his actions, such dislike is not an unfair labor practice. Instead of being detrimental to his cause, the fact that Dr. Chiaramonte was *silent* on the bonus issue weighs in his favor. The doctor was confronted with a situation during late 1981 in which a great deal of ambiguity existed as to whether or not he was required to give a Christmas bonus. The usually outspoken doctor chose to say nothing instead of issuing explanatory statements which could later have been viewed as manipulative. There was absolutely no evidence introduced to suggest that Dr. Chiaramonte's silence was intended to influence or manipulate the votes of the hospital employees. More likely, the doctor's silence evidences a "good faith effort to conform to the requirements of the law." *Dorn Transportation Co.,* 405 F.2d at 715; *see also J.J. Newberry Co. v. NLRB,* 442 F.2d 897, 900 (2d Cir.1971); *Free-Flow Packaging,* 566 F.2d at 1130.

In summary, we find no support for a finding that the hospital committed an unfair labor practice by not giving a 1981 Christmas bonus. There was no evidence to indicate that a yearly Christmas bonus was an established practice, nor was there substantial evidence that the hospital withheld the bonus in an attempt to influence the election. As a consequence, we refuse to enforce the Board order finding violations of § 8(a)(1) and (3) and requiring payment of a 1981 bonus to affected employees.

---

**4.** Kearney testified that his question to Morris was: "Jim, between me and you as workers, is the union really—what is the reason that we didn't get the bonus? Was it the union?"

## II

### OTHER CLAIMED VIOLATIONS

Beyond the bonus issue, there are three additional unfair labor practice findings which we refuse to enforce: (1) the finding of a § 8(a)(1) violation based upon Dr. Chiaramonte's "confiscation" of union campaign literature; (2) the finding of a § 8(a)(1) violation resulting from the hospital's creation of an "Employee of the Month" award; and (3) the finding of a § 8(a)(1) and (3) violation for discriminatory discipline of a union-supporting employee.

### A.

The facts concerning the confiscation issue are uncontroverted. On September 17, 1981, employee Mary Cox was distributing copies of the OPEIU newsletter at the cafeteria entrance. Dr. Chiaramonte came upon her and asked what she was doing. She offered him a copy of the newsletter. The doctor grabbed the eight to ten copies she had in hand and proceeded to the cafeteria kitchen where he offered the newsletters to kitchen workers with the words, "Does anybody want these?" He returned to Cox's table about five minutes later and returned the one copy of the newsletter he had not distributed. During the doctor's absence, Cox had reached into a nearby box for more copies of the newsletter, which she continued to distribute.

■ The Board found that Dr. Chiaramonte interfered with his employees' § 7 rights by confiscating union campaign materials. There is no support for this finding. The evidence shows that the doctor distributed to employees most of the eight to ten newsletters he took. He returned to employee Cox the one copy that he did not pass out. Also, Cox had a box full of newsletters available to her to replenish her supply upon the doctor's departure. There was no finding that Cox or any other employee was intimidated by the incident; indeed, Cox continued to distribute newsletters during the doctor's absence. We find that the doctor's conduct in this case was at most a minimal intrusion upon employees § 7 rights and was not violative of the Act. See *Graham Architectural Products Corp. v. NLRB*, 697 F.2d 534, 541–42 (3rd Cir.1983); *NLRB v. First National Bank of Pueblo*, 623 F.2d 686, 692 (10th Cir. 1980).

### B.

The facts surrounding the creation of an "Employee of the Month" award are similarly undisputed. Hospital Special Projects Director Margaret Greenway testified that when she came to work at the hospital in August 1981 as a special assistant to Dr. Chiaramonte for public relations matters, she discussed with him the desirability of reinstituting a program of employee recognition. She claimed that she was unable to uncover details of the former program since the previous public relations director was no longer employed at the hospital. The record is unclear as to the exact nature of the earlier program, but evidence indicates that the hospital had held annual banquets in past years at which prizes and awards were given to deserving employees. In October 1981, Greenway released a bulletin announcing the "Employee of the Month" program which offered a prize of $100 to the individual winner each month.

The ALJ adopted the presumption that because of its timing, the award was granted for the purpose of influencing employees to vote against the union. The judge went on to dismiss the hospital's explanation that it was merely reintroducing a previously-established employee recognition program. The Board qualified this finding in a footnote to its order stating that it agreed that there was a § 8(a)(1) violation, but that "we find it unnecessary to rely on the Board's policy of presuming the unlawfulness of grants of benefits during the pre-election period."

■ We refuse to enforce the Board's order on this point. As a technical matter, the Board's decision not to rely on the presumption of unlawful motivation is fatal to the Board's finding. Without the presumption, there is absolutely no evidence

that the hospital reinstituted this employee recognition program for the purpose of influencing the election. Moreover, even if the presumption were invoked, we are unconvinced that the effect of the award, given the context of its creation, was substantial enough to constitute a violation of the Act. Considering both the length of the organizational drive and the large number of hospital employees, the designation of one individual as employee of the month can not reasonably be said to be so significant as to influence in any way the attitude of the employees or the outcome of the election.

### C.

The Board found that the hospital committed violations of § 8(a)(1) and (3) of the Act by disciplining employee and union supporter Patricia Vass "for conduct it would have ignored were it committed by others." In particular, the Board found that the hospital discriminatorily applied its no solicitation rule against Vass on two separate occasions because of her known union activism.

The first incident occurred on September 30, 1981, when Nurse Elizabeth Wustner observed Nurse Vass, who was not known to Nurse Wustner at the time, looking at a departmental time roster on a desk top at the nurse's station. When Wustner asked Vass what she was going, Vass replied that she wanted to find out how many registered and practical nurses were on the roster. Vass was wearing a union button, and when asked if she was gathering information for the union, Vass responded that the information was for her personal use. Wustner told Vass to come back later to ask the head nurse for permission to view the list. Subsequently, Wustner reported

the incident to Head Nurse McCormick, who recognized the description of Vass, a known union supporter. McCormick asked Wustner to prepare a written statement and submit it to Director of Nurses Margaret Miller.

Miller, in accordance with her usual practice in such matters, wrote up a verbal counseling report with the intention of then calling in Vass to discuss it. Miller testified that if Vass had been able to explain satisfactorily her conduct, then Miller would have destroyed the report. Vass, however, refused to meet with Miller, claiming that she had a right to be accompanied by a union representative.[5] Miller told Vass that she had no such right, and when Vass refused again to discuss the matter, Miller let the report stand.

The second event occurred in December 1981. According to the record, Pharmacy Technician Hanaa Malaty was serving as a translator for Vass and several other nurses with an Arabic patient. As Vass and Malaty left the patient's room, Vass asked for a list of telephone numbers of pharmacy employees. Malaty agreed to bring the list, which she delivered to Vass on her next round. Later, a supervisor recognized Malaty's description of Vass and chastised Malaty for giving the list, which the hospital maintains was confidential, to a union supporter.

The Director of Pharmacy Stanley Sherman, sent an incident report to Miller. Miller then drafted an official reprimand in which she noted that this was the second time that Vass had been caught interrupting the work of another employee. The reprimand warned of a possible termination or suspension if Vass's conduct continued. Miller called Vass to discuss the report, but

---

**5.** Vass did not raise before the Board this alleged pre-election right to union representation in a disciplinary matter. The Supreme Court has acknowledged an employee's right to representation in such matters once a union has been certified. *NLRB v. J. Weingarten, Inc.,* 420 U.S. 251, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975). Other circuits have struggled with the question of whether employees have a *Weingarten* right in non-union situations or prior to union certifica-

tion. *See E.I. du Pont de Nemours and Company, Inc. v. NLRB,* 707 F.2d 1076 (9th Cir.1983); *Anchortank, Inc. v. NLRB,* 618 F.2d 1153, 1161 (5th Cir.1980). This circuit has never recognized a pre-election right to representation in disciplinary matters. Since Vass did not raise the issue before the Board, we assume, without deciding, that Vass had no right to the presence of a union representative in her meetings with Miller.

again Vass claimed a right to the presence of a union representative and refused to discuss the matter in any way. Under the circumstances, Miller had no choice but to let the reprimand stand.

The Supreme Court and the NLRB have both recognized a hospital's right to prohibit solicitation in patient care areas. *See Beth Israel Hospital v. NLRB*, 437 U.S. 483, 98 S.Ct. 2463, 57 L.Ed.2d 370 (1978); *St. John's Hospital & School of Nursing, Inc.*, 222 N.L.R.B. 1150 (1976). The rationale behind this rule is that "the primary function of a hospital is patient care and ... a tranquil atmosphere is essential to the carrying out of that function." *St. John's Hospital*, 222 N.L.R.B. at 1150. In this case, Southern Maryland Hospital Center had such a no solicitation rule for patient areas. The issue before us is whether the hospital's application of the rule with respect to employee Vass constituted an unfair labor practice. There is no substantial evidence to support such a conclusion.

Under the Board rule approved by the Supreme Court in *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983), in order to show a violation of § 8(a)(1) and (3), the General Counsel must prove as part of his *prima facie* case that an employee's protected § 7 conduct was a substantial or motivating factor in the adverse action taken against the employee. The employer may then avoid being charged with an unfair labor practice by showing what his actions would have been regardless of his forbidden motivation. *Id.* 462 U.S. at 401–02, 103 S.Ct. 2474.

The Board found that the General Counsel successfully showed anti-union animus as a possible motivating factor in the disciplining of Vass. We defer to the Board's finding of fact on this motivational issue as it is based upon substantial evidence. The record reveals, however, that the hospital had a rule which explicitly forbade the type of conduct in which Vass engaged. Union solicitation was liberally allowed in various parts of the hospital, but not in patient areas, and if Vass was unaware of this

prior to the incident with Nurse Wustner, she was certainly aware of it when she interrupted the work of Technician Malaty to obtain the telephone list. Director of Nurses Miller followed her normal procedure upon receiving the complaints about Vass, writing up a counseling report in the first case and a reprimand in the second case, and then asking Vass to come in to discuss the matters. Vass refused to appear without a union representative, and Miller therefore had to let the reprimands stand. Had Vass agreed to talk to Miller, it is possible that the two reports would have been destroyed and thus would not have been included in Vass's file.

■ In dismissing the hospital's explanation for the discipline, the Board relied heavily on evidence that some raffle tickets, Girl Scout cookies and cosmetics were sold by employees without reproach under the hospital's rule. The Board submits that this proves discriminatory application of the rule. However, to follow the Board's reasoning to its logical conclusion, the fact that the hospital had allowed some innocuous activity to go unpunished in the past would mean that *any* subsequent attempt by the hospital to control union solicitation in its patient care areas would have amounted to an unfair labor practice. The care of patients is too important to allow such a result. As a consequence, we refuse to enforce the Board's order on this point, finding that the hospital undisputedly showed (1) a violation of its no solicitation rule, (2) a failed attempt to resolve the dispute and possibly withdraw the discipline, and (3) final disciplinary actions in proportion to the conduct involved.

### III

To summarize, we refuse to enforce paragraphs 1(a), (b), (e), (i) and (j), and 2(a), (b) and (c) of the Board's order because they were not supported by substantial evidence on the record as a whole. We find, however, that the numerous remaining § 8(a)(1) violations found by the Board are supported by substantial evidence and are entitled to enforcement.

*ENFORCED IN PART, REFUSED IN PART.*