**OPINION ON REHEARING**

**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

NATIONAL LABOR RELATIONS BOARD,
*Petitioner,*

v.

PEPSI COLA BOTTLING COMPANY OF
FAYETTEVILLE, INCORPORATED,
*Respondent.*

No. 00-1969

On Application for Enforcement of an Order
of the National Labor Relations Board.
(11-CA-14889, 11-CA-15034, 11-CA-15181, 11-CA-15281,
11-CA-15289, 11-CA-15383, 11-CA-15556)

Argued: May 8, 2001

Decided: October 12, 2001

Before NIEMEYER, WILLIAMS, and KING, Circuit Judges.

---

Enforcement granted in part and denied in part by unpublished per
curiam opinion.

---

**COUNSEL**

**ARGUED:** Thomas Witbeck Budd, CLIFTON, BUDD &
DEMARIA, L.L.P., New York, New York, for Pepsi. Robert James
Englehart, Supervisory Attorney, NATIONAL LABOR RELATIONS
BOARD, Washington, D.C., for Board. **ON BRIEF:** Scott M. Wich,
CLIFTON, BUDD & DEMARIA, L.L.P., New York, New York, for

Pepsi. Leonard R. Page, Acting General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Board.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

The National Labor Relations Board (NLRB) petitions to enforce an order that it issued after proceedings held following a remand by this Court, in which the NLRB found that the Pepsi-Cola Bottling Company of Fayetteville, Inc. (Pepsi) violated §§ 8(a)(3) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158 (West 1998) (the Act), by unilaterally changing various employment practices and policies. Because substantial evidence in the record indicates that each of the changes implemented by Pepsi represented material changes to the terms and conditions of employment, and further, that the United Food and Commercial Workers, Local 204, AFL-CIO-CLC (the Union) did not waive its right to bargain over these changes, we grant enforcement of the NLRB's order, except insofar as it finds that salesman Jerry Parker is entitled to reinstatement.

I.

A.

The NLRB has found that Pepsi violated the Act by unlawfully implementing a change to its moving violations policy, resulting in the discharge of two employees, by unlawfully changing its "zero settlement" policy, resulting in the discharge of one employee, by unlawfully changing other terms and conditions of employment, and by unlawfully withholding a wage increase from employees. *Pepsi-*

*Cola Bottling Co. of Fayetteville*, 330 NLRB No. 134 (2000) (hereinafter *NLRB II*). In 1994, the NLRB made the same conclusions. *Pepsi-Cola Bottling Co. of Fayetteville*, 315 NLRB 882 (1994) (hereinafter *NLRB I*). It sought enforcement before this Court, which enforced the NLRB's order in part, denied enforcement in part, and remanded to the NLRB for further development of the record on remaining issues. *NLRB v. Pepsi-Cola Bottling Co. of Fayetteville*, No. 95-1924, 1996 U.S. App. LEXIS 23936 (4th Cir. Sep. 10, 1996) (unpublished) (hereinafter *Pepsi I*). This Court upheld the NLRB's determination that two employees, Hyatt and Faas, were terminated based on anti-union animus in violation of § 8(a)(3) of the Act, reversed the NLRB's determination that two employees, Deskin and Evers, were made to change tires and clean garage drains on the basis of anti-union animus, and remanded with respect to the issues now raised by this appeal. *Id.* at *22. Following this Court's remand, two days of additional evidentiary hearings were held before an Administrative Law Judge, whose findings that Pepsi violated the Act in each of the areas alleged were upheld by the NLRB. The NLRB now petitions for enforcement of its order.

## B.

Pursuant to a petition filed by the Union, the NLRB ordered a representation election at Pepsi's Fayetteville, N.C. plant, which was held on October 11, 1991. The preliminary result of the election showed 33 votes in favor of representation, 31 against, and 3 determinative ballots challenged by the NLRB agent on the ground that the employees' names did not appear on the voter eligibility list. After proceedings to resolve a challenge to these disputed ballots, the NLRB resolved the challenged ballots favorably to the Union on August 17, 1992, and on September 4, 1992, the Union was certified by the NLRB as the bargaining agent for the bargaining unit employees at the Fayetteville plant. Thereafter, Pepsi took several actions which the NLRB held to constitute unfair labor practices in violation of the Act. We will examine the record regarding each of these actions in turn.

### 1.  *The Annual Wage Increase*

First, the NLRB found that Pepsi illegally withheld a customary annual pay increase from the non-supervisory employees at the Fay-

etteville plant, during the interval between the representation vote and the resolution of challenges to several determinative ballots. The evidence indicates that in or about August of each year, Pepsi's corporate parent, Pepsi Bottling Ventures, LLC, estimates a cap on wage increases for the following year and gives this estimate to each of Pepsi's facilities; in turn, these facilities have latitude to determine if, and how much, of a wage increase to give each individual employee, subject to the requirement that the total payroll increase for each facility must be within the cap authorized by the corporate office. In 1992, with the exception of the Fayetteville plant, each of Pepsi's facilities provided a general, across-the-board pay increase for employees. At the Fayetteville facility in 1992, management decided to grant pay increases to all supervisory employees while withholding wage increases from all non-supervisory employees, that is, employees who would be in the Union bargaining unit if the Union won the election and was certified by the NLRB.

David Schriber, a former route salesman for Pepsi at the Fayetteville plant, testified at the remand hearing that he worked at the Fayetteville plant from 1987 to 1993, and received a one cent per case cost of living increase in his commission every year except 1992. Schriber also testified that in February 1992 he attended a meeting where the subject of wage increases came up and that at this meeting, Fayetteville General Sales Manager Randall Kennedy stated that raises were delayed because Pepsi was waiting for the NLRB to resolve the ballot challenges and determine whether the Union had won the representation election. Thomas Leak, another former employee at the Fayetteville plant, testified that he worked for Pepsi from 1986 to 1997 and received an annual pay increase during every year except 1992. Kennedy testified that he did not have knowledge of the decision making process at the Fayetteville plant for wage increases prior to 1992, when he transferred to Fayetteville from the Lumberton plant, but that at the Lumberton plant it was customary to grant a general wage increase to all, or nearly all, employees within the wage increase parameters set by Pepsi headquarters each year.

In *Pepsi I*, this Court remanded the wage increase issue to the NLRB for the NLRB to, *inter alia*, "identify the employees, if any, affected by the wage increase," explain possible inconsistencies in the

NLRB's position regarding the wage increase,* develop additional evidence regarding whether the wage increase was discretionary in nature, and explain the effect of any compliance proceedings regarding the wage increase. *Pepsi I*, 1996 U.S. App. LEXIS 23936, at *14. In its decision, the NLRB determined that compliance proceedings would be a better device to determine the specific affected employees. *NLRB II*, 330 N.L.R.B. No. 134 at *3 n.10. The NLRB denied having adopted inconsistent positions regarding the wage increase and pointed to additional record evidence adduced on remand indicating that the wage increase was not discretionary. *Id.* at *17.

## 2.   *Zero Settlement*

On December 9, 1991, Pepsi announced a change in its zero settlement policy; this policy requires drivers to account for any discrepancy between payments received and the number of cases of soda missing from their trucks. Prior to the change, employees were required to account for their stock on a daily basis and pay any shortfall to Pepsi on a weekly basis. After the new policy, as a memorandum from Randall Kennedy explains, drivers were required to account for their stock on a daily basis and immediately pay any shortfall at the end of each business day. Both prior to and after the zero settlement policy, drivers were required to account for their stock each day; the difference was that before zero settlement, drivers had

---

*Pepsi argued below, but does not argue on appeal, that the NLRB has taken inconsistent positions regarding the discretionary nature of the withheld 1992 wage increase. Apparently Pepsi was referring to the inconsistency allegedly created by the NLRB's finding that the withheld 1992 wage increase was customary vis a vis the Office of General Counsel's 1993 refusal to pursue a claim that the similar 1993 wage increase was customary. Pepsi also could have been referring to the NLRB's apparent doctrine that the Act is violated when an employer fails to grant a customary raise prior to the certification of a union, while the Act also may be violated when an employer grants a customary raise prior to certification because the raise may be viewed as an impermissible attempt to "buy off" employees in order to cause them to vote against unionization. (*See* J.A. at 388-389); *Perdue Farms, Inc. v. NLRB*, 144 F.3d 830, 839 (D.C. Cir. 1998) (Randolph, J., dissenting in part) (describing as "unimaginable" the NLRB's position that both the granting and withholding of customary pre-election wage increases violate the Act).

until the end of the week to locate and return any missing stock before being required to pay for the shortage, whereas after zero settlement, payment had to be made at the end of each day. Jerry Parker, whom the NLRB asserts was terminated based on the new zero settlement policy, paid his shortage on the day it occurred and was terminated a week later for failing to settle his account correctly.

The undisputed record evidence indicates that the Union was not given formal notification of the zero settlement policy before it was implemented, but that at some point after the policy was announced, the Union's representatives heard of the new policy from employees. The Union filed an unfair labor practice charge with the NLRB, but did not request bargaining over the new policy.

### 3.  *Moving Violations/Accidents*

Pepsi has long had a policy providing that employees who drove company vehicles would be discharged if they committed too many moving violations or were involved in an excessive number of chargeable (i.e. at-fault) accidents within a given period of time. On January 14, 1993, Pepsi announced a change in its moving violations policy, the precise nature of which is not entirely clear from the record. The NLRB's original decision held that the "new" policy was that "moving violations without convictions and accidents without fault" now counted against an employee. *NLRB I*, 315 NLRB at 897. Pepsi asserts that no record evidence demonstrates that the "new policy" was actually new; the company contends that Pepsi's policy had always been to count a *citation* against the moving violations limit, leaving the citation on the employee's record unless and until the employee was fully acquitted. Thus, Pepsi asserts that the policy both before and after the "change" was that an employee who had, for example, two moving violation convictions or unacquitted citations would be immediately terminated upon receipt of his or her third citation, without awaiting the result of court proceedings. Randall Kennedy testified that prior to the announcement of the "new" policy, he had informed employees eight to twelve times that citations counted for purposes of the moving violations policy even if the charges were later reduced. The Union was not notified prior to the implementation of the "new" moving violations policy.

### 4.  *Compensation for Drivers and Salesmen*

In July 1992, Pepsi unilaterally changed the compensation system for bulk truck drivers, "tell-sell" (restaurant-focused) salesmen, and "full-service" (vending machine focused) salesmen. This change involved moving from a pure commission system to a system characterized by a lower commission and an hourly wage. One employee testified that the new system reduced his compensation. The Union was not notified in advance of this change.

### 5.  *Changes in Starting Times and Work Schedules*

In July 1993, Pepsi changed the work schedules of merchandisers so that they were required to work nearly every Saturday, but received a day off during the week. At the same time, Pepsi changed the starting time for route salesmen from 6 A.M. to 5:45 A.M. The Union was not notified in advance of the announcement of these changes. When the Union learned of the changes, it wrote to Pepsi requesting bargaining, but to no avail. Pepsi, without prior notice to the Union, also changed the work schedules of sparemen so that they no longer performed work substituting for regular drivers.

### 6.  *Break Periods and Telephone Privileges*

On May 12, 1992, Pepsi eliminated employees' ability to make and receive personal telephone calls at work, changed break periods, and restricted the ability of employees to converse during lunch. The Union was not notified in advance of these changes.

### II.

### A.

The NLRB's interpretations of the Act are entitled to deference if they are reasonable, even if the NLRB's reading of the Act is not "the *best* way to read the statute." *Holly Farms Corp. v. NLRB*, 517 U.S. 392, 409 (1996) (emphasis in original). "If the NLRB's legal interpretations are rational and consistent with the Act, they will be upheld by reviewing courts." *Sam's Club v. NLRB*, 173 F.3d 233, 239 (4th

Cir. 1999) (internal quotation marks omitted). "When we review mixed questions [of fact and law], the NLRB's application of legitimate legal interpretations to the facts of a particular case should be upheld if they are supported by substantial evidence based upon the record as a whole." *Id.* at 239-40. Substantial evidence review must consider evidence which detracts from as well as supports the NLRB's findings, and substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (internal quotation marks omitted). A reviewing court engaged in substantial evidence review may not "displace the NLRB's choice between two fairly conflicting views" of the evidence, "even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

### B.

Pepsi argues that because this Court decided in an earlier appeal that a remand was necessary to further develop the factual record regarding the materiality of the various changes to Pepsi's policies, the NLRB is precluded from re-arguing the sufficiency of the prior record on appeal.

Under the doctrine of law of the case,

> [w]hen a decision of an appellate court establishes the "law of the case," it must be followed in all subsequent proceedings in the same case in the trial court or on a later appeal . . . unless: (1) a subsequent trial produces substantially different evidence, (2) controlling authority has since made a contrary decision of law applicable to the issue, or (3) the prior decision was clearly erroneous and would work manifest injustice.

*Sejman v. Warner-Lambert Co.*, 845 F.2d 66, 69 (4th Cir. 1988) (internal quotation marks omitted); *see Plyler v. Evatt*, 924 F.2d 1321, 1328 (4th Cir. 1991). The law of the case doctrine is "not an inexorable command but rather a prudent judicial response to the public policy favoring an end to litigation." *Sejman*, 845 F.2d at 69 (internal quotation marks omitted).

Pepsi's principal argument is that the NLRB is precluded from arguing the sufficiency of the pre-remand record to establish the materiality of Pepsi's unilateral policy changes. Pepsi contends that because this Court directed the NLRB to address the materiality of the unilateral changes on remand, we have of necessity already determined that the original record was legally insufficient to establish the materiality of the changes. Were materiality the only reason for our earlier remand, this logic would be compelling. The primary basis for this Court's remand to the NLRB, however, was a lack of evidence regarding the issue of whether the Union received effective notice of the changes and thus waived its right to bargain over them. *Pepsi I*, 1996 U.S. App. LEXIS 23936, at *20-22. Thus, our mention of the desirability of adducing additional materiality evidence on remand does not compel a conclusion that we found the existing materiality evidence to be legally insufficient; it means merely that, after deciding to remand the findings at issue on other grounds, we determined that additional materiality evidence would be helpful. Based upon our review of our prior opinion in this case, we conclude that the NLRB is precluded from re-arguing the sufficiency of the original record as to notice and waiver issues — the principal bases for our remand — but not as to materiality.

### III.

### A.

This Court, in *Pepsi I*, stated that because the parties had not submitted evidence that there was an established practice of awarding wage increases at the Fayetteville plant, "we cannot determine how established any practice of paying wage increases was, nor can we determine whether any discretion entered the calculus for disbursing the wage increase." *Pepsi I*, 1996 U.S. App. LEXIS 23936 at *13 (4th Cir. Sep. 10, 1996). We noted that absent an anti-union motive, an employer may disburse or fail to disburse discretionary bonuses, but noted, however, that if a practice of paying bonuses is well-established, withholding such a bonus unilaterally may violate the Act. *See* id. at *13-14; *Phelps Dodge Mining Co. v. NLRB*, 22 F.3d 1493, 1496-1500 (10th Cir. 1994) (holding that where there was no established practice of distributing bonuses, employer was not required to bargain over their distribution). This Court, in *Southern*

*Maryland Hosp. Ctr v. NLRB*, 801 F.2d 666 (4th Cir. 1986), summarized the law in this area as follows:

> There is general agreement that when an employer by promises or by a continuous course of conduct has made a particular benefit part of the established wage or compensation system, then the withholding of that benefit during an organizational campaign raises the inference of improper employer conduct. An employer can avoid the finding of a violation in such a case only if he can separately justify his action with a legitimate business purpose. On the other hand, when there is no "established practice" of granting benefits, the General Counsel must show that the employer's withholding of particular benefits was motivated by anti-union sentiment to prove a violation of the Act.

*Id.* at 668-69 (internal citation omitted). We found that a one-time payment of a Christmas bonus the year before a union election did not suffice to establish a practice of paying such bonuses, so that the employer was not required to bargain before declining to pay the bonus again; further, we held that isolated anti-union comments made to a handful of employees did not suffice to demonstrate that the bonus was withheld based on anti-union animus. *Id.* at 670-71. If a company has a longstanding practice of granting wage increases to keep up with the cost of living, a certain amount of discretion as to the amount of the wage increase does not prevent the regular wage increase from becoming a condition of employment and, thus, a subject of mandatory bargaining. *NLRB v. Beverly Enter.-Massachusetts, Inc.*, 174 F.3d 13, 25 (1st Cir. 1999).

Pepsi argues that the NLRB, on remand, failed to develop sufficient evidence either that the wage increases at the Fayetteville plant occurred over a number of years or that Pepsi lacked discretion in determining whether to raise wages and if so, by what amount. The NLRB argues that evidence adduced at the remand hearing established that Pepsi budgeted annual wage increases for each of its thirteen North Carolina plants; that on each of six occasions prior to 1992, each North Carolina plant granted general wage increases to all, or nearly all, employees; that the Fayetteville plant was the only Pepsi facility in North Carolina to decline to grant a pay increase to bargain-

ing unit employees in 1992; and that this decision was a distinct departure from the practice of management at the Fayetteville plant prior to 1992. The NLRB also notes that the *Southern Maryland* Court held that the withholding even of a *discretionary* benefit violates the Act when motivated by specific anti-union animus, and here, the record shows that Pepsi told employees prior to the election that if they voted for the union, Pepsi would freeze wages. Moreover, in announcing that no wage increase would be given, Pepsi stated that the pendency of the NLRB proceedings to resolve the union election was the reason for its decision.

We conclude that while the NLRB's evidence at the remand hearing could have been more complete, its determination that Pepsi established over a number of years a regular pattern of granting general wage increases at the Fayetteville plant is supported by substantial evidence. David Schriber, who worked at the Fayetteville plant from 1987 to 1993, testified that Pepsi "normally" announced a one cent per case increase in driver commissions during November or December of each year (J.A. at 329), and the only year that this did not occur was 1992, when Kennedy announced to the delivery drivers that the wage increase was "waiting on the [NLRB] to make a decision on the [election ballot challenge] case." (J.A. at 331.) Kennedy himself testified that during every year that he worked at the Lumberton plant, management implemented a broad-based wage increase based on the targets provided by Pepsi's corporate headquarters. The NLRB could reasonably infer that practice was similar at the Fayetteville plant, there being no evidence to the contrary and some evidence (Schriber's testimony) supportive of this view. Thomas Leak, a salesman at the Fayetteville plant from 1986 to 1997, stated that towards the end of every year of his tenure except 1992, the company held a meeting for all sales employees and announced a general pay increase.

Pepsi argues that the NLRB has failed to carry its burden on this issue because it introduced no evidence of the process for setting pay increases at the Fayetteville plant. Pepsi misconceives the nature of the controlling legal standard. Some discretion as to the amount of the increase does not cause the increase to become discretionary in its entirety and thus, not a subject of mandatory bargaining. Substantial evidence was adduced at the remand hearing that Pepsi's Fayetteville

plant generally, during every year except 1992, granted wage increases in line with the cap set by corporate headquarters. The failure to grant any wage increase at all in 1992 to the bargaining unit employees was obviously a change in Pepsi's customary practice. This situation is utterly unlike the occasional, sporadic, indeed one-time, Christmas bonus at issue in *Southern Maryland*. *See Southern Maryland*, 801 F.2d at 668. Here, a reasonable finder of fact could conclude that Pepsi generally granted cost of living increases to bargaining unit employees from 1986 to 1991, did not do so in 1992 immediately following the Union vote and while the results of the election were pending, and resumed doing so after 1992. Thus, annual wage increases were a condition of employment and could not be varied unilaterally by Pepsi during the pendency of the union election results. Further, if there were an evidentiary infirmity in the NLRB's finding that pay increases were a customary practice, such an infirmity would be irrelevant because *Southern Maryland* held that even a discretionary benefit may not be withheld out of anti-union animus. *Id.* at 669. Here, Pepsi's statement before the representation election that it would freeze wages if the union won the election provides reasonably strong evidence that its freezing of wages after the union election — explicitly in order to see how the election would turn out after the ballot challenge — was motivated by such animus.

We thus conclude that the NLRB adduced sufficient evidence on remand to establish that the withheld 1992 wage increase was customary, and thus, Pepsi's act of withholding it from the Fayetteville bargaining unit employees violated the Act.

### B.

The NLRB found that Pepsi violated 29 U.S.C.A. § 158(a)(5) by unilaterally changing the method of compensation for bulk truck drivers, restaurant-focused ("tell-sell") salesmen, and vending machine ("full-service") salesman; changing telephone access, break period, and lunch period policies; and implementing the zero-settlement policy, without providing advance notice to the Union. *NLRB II*, 330 N.L.R.B. No. 134, at *22-23 (2000). An employer violates 29 U.S.C. § 158(a)(5) if it unilaterally amends terms or conditions of employment if it has not bargained with the Union regarding the unilateral amendments. *Oneita Knitting Mills, Inc. v. NLRB*, 375 F.2d 385, 388

(4th Cir. 1967). If the Union has notice of an employer's unilateral amendments, but does not request bargaining, the Union waives the right to bargain. *YHA, Inc. v. NLRB*, 2 F.3d 168, 173-74 (6th Cir. 1993); *W.W. Grainger, Inc. v. NLRB*, 860 F.2d 244, 248-49 (7th Cir. 1988) (stating that "a union, which has notice of a proposed change which affects a mandatory bargaining subject, must make a timely request to bargain. Moreover, formal notice is not necessary as long as the union has actual notice. A union's failure to assert its bargaining rights will result in a waiver of these rights." (internal citation omitted)). In *Pepsi I*, this Court stated that "[t]o demonstrate that the Union waived the right to bargain over the unilateral amendments, Pepsi must show the right to bargain was clearly and unmistakably relinquished." *Pepsi I*, 1996 U.S. App. LEXIS 23936 at *20-21 (internal quotation marks omitted). The ALJ observed on remand that this language appears to assign the burden of proof on this issue to Pepsi rather than the NLRB; Pepsi counters that this cannot be the case because the NLRB always bears the burden of proof of showing unfair labor practices. Pepsi is precluded from making this argument for the same reason that the NLRB is precluded from arguing that the prior record was sufficient as to notice and waiver: this Court's prior opinion is the law of the case. Thus, Pepsi bears the burden of proof of showing that the Union clearly waived its right to bargain over various unilateral policy changes; this approach comports with the ordinary rule that the burden of proving affirmative defenses to liability rests with the defendant.

In *Pepsi I*, Pepsi asserted that the Union had notice of the new zero settlement policy, the moving violations policy, and other alleged policy changes, and by failing to request bargaining, waived any objections to these alleged changes. This Court stated that it could not properly evaluate this argument because Pepsi had not "provide[d] any particulars, such as the type of notice, how the notice was conveyed, or the length of time the Union had to respond to the proposal[s] to implement unilateral amendments." *Pepsi I*, 1996 U.S. App. LEXIS 23936 at *21. On this issue, the NLRB did develop significant additional evidence on remand. The ALJ, in a finding adopted by the NLRB, credited the testimony of Union representative Shelda Upchurch, who testified that Pepsi provided no notice to the Union prior to announcing the changes to the employees and that she learned

of the changes only by hearing of the announcement from employees. *NLRB II*, 330 N.L.R.B. No. 134 at *22.

Pepsi argues that numerous Board and court decisions establish that formal notice to the Union is not necessary where the Union has actual notice of a proposed policy change; thus, Pepsi argues, the "notice" test is a practical one, and the Union's actual knowledge of the changes, obtained through employees who contacted the Union, means that the Union's failure to request bargaining amounts to a waiver. *See Haddon Craftsmen, Inc.*, 300 NLRB 789, 790 (1990); *Southern California Stationers*, 162 NLRB 1517, 1543 (1967). Because certain of the policy changes — such as zero settlement — had not been formally implemented when announced, Pepsi argues that the evidence establishes that the Union did, in fact, have notice prior to implementation of the proposed changes.

Pepsi is correct that indirect notice to a union may suffice to require the union to request bargaining at risk of waiving its bargaining rights. *W.W. Grainger*, 860 F.2d at 248. The difficulty with Pepsi's argument is that the decisions on which it relies — in particular, *Haddon Craftsmen* — have been limited by later decisions of the NLRB and the courts to situations in which the changed policy was not announced to employees as a *fait accompli* prior to the notification of the Union. *See Roll & Hold Warehouse & Distr. Corp.*, 325 N.L.R.B. 41, 42 (1997) (distinguishing *Haddon Craftsmen* on the basis that in that case, "notice was given to union officials . . . before general notice was given to employees," and holding that "a union's role in [the collective bargaining] process is totally undermined when it learns of the change incidentally upon notification to all employees"), *enforcement granted*, 162 F.3d 513, 519 (7th Cir. 1998) (stating, "we find . . . convincing the NLRB's second reason for finding that no opportunity for reasonable negotiation existed here: that by presenting the plan directly to employees before notifying the Union, the Union's negotiating role was seriously undermined. . . . When an employer first presents a policy to its employees without going through the Union, the Union's role as the exclusive bargaining agent of the employees is undermined."). The current state of the law, therefore, is that informal notice of proposed changes is sufficient, but the presentation as a fait accompli of a complete plan directly to employees without any prior contact, formal or informal, with the Union does

not create effective notice such that the Union's failure to request bargaining creates a waiver. The deference given to the NLRB's interpretations of the Act causes us to conclude that this interpretation of the Act is within the range of reasonable interpretations to which this Court must defer. *See id.* at 520 (deferring to the NLRB's conclusion that a full-blown announcement of a new policy directly to employees prior to notifying the Union "harmed [the Union] enough to justify its failure to demand bargaining"). Thus, accepting the NLRB's decision to credit Upchurch's testimony that the Union received notice of the proposed changes only after they were announced generally to employees, we conclude that the Union did not waive its right to bargain over these changes by failing to request bargaining. As a result, if the changes were material alterations of the terms and conditions of employment, Pepsi's unilateral imposition of the changes violated the Act.

### C.

A duty to bargain over changes to wages, hours, or terms or conditions of employment arises only if these changes are "material, substantial, and . . . significant one[s] affecting the terms and conditions of employment of bargaining unit employees." *Angelica Healthcare & Serv. Group*, 284 NLRB 844, 853 (1987) (internal quotation marks omitted). Pepsi argues that the zero-settlement policy, moving violations policy, new compensation scheme for salesmen and drivers, and miscellaneous changes in telephone and breaks policy, work starting times, etc., were not material. Having concluded that the Union did not waive its right to bargain over the changes and that the NLRB is not precluded from arguing the sufficiency of the original record, we will address the materiality of each of the unilateral changes in turn.

### 1.  *Zero Settlement*

The NLRB argues that the new zero settlement policy was a material change because (1) it substantially inconvenienced employees because if they were short on stock at the end of one day, they could not subsequently locate the missing stock and avoid having to personally pay for the shortage; and (2) salesman Jerry Parker was discharged for violating the new system, demonstrating its materiality. Union representative Sheila Upchurch testified to the inconvenience

that the new zero settlement policy caused for drivers and route sales-men.

Pepsi argues persuasively that Parker was not terminated as a result of the new aspects of zero settlement. The record indicates unmistak-ably that he was terminated for failing to settle his account to zero each day, which was required even under the old system, but was not terminated for failing to pay the shortfall on a daily, as opposed to weekly, basis, which was the only change to the policy; uncontro-verted evidence demonstrates that Parker paid for his shortage on the day it occurred and thus cannot possibly have been terminated for failing to do so. We thus conclude that Parker was not terminated as a result of the new policy, and the NLRB's reliance on his termination as evidence of materiality was error. As a result, we must deny enforcement of the Board's order insofar as it orders Pepsi to reinstate Parker.

Upchurch's testimony that the zero settlement policy greatly incon-venienced drivers, however, suffices to enable the NLRB to carry its materiality burden. Given the deference accorded the NLRB's deter-mination of what is a mandatory subject of bargaining, *see Beverly Enter.-Massachusetts*, 174 F.3d at 29, we conclude that the require-ment that drivers and salesmen pay shortfalls on a daily, as opposed to a weekly, basis imposes substantial inconvenience and thus should be regarded as a material change in the terms and conditions of employment. Requiring employees to pay shortfalls on a daily basis requires them to carry sufficient cash each day to pay any shortfall and prevents them from making up for a shortfall on one day with an overage during the same week, as, for example, when extra cases of product are inadvertently delivered to a customer but can be returned the following day. We therefore uphold the NLRB's finding that the unilateral imposition of the new zero settlement policy violated the Act.

### 2.  *Telephone Access, Break Periods, and Lunch Periods*

The NLRB found, based upon substantial evidence, that Pepsi changed its break period policy to limit employees to two 15-minute break periods, placed new restrictions on conversations among employees during their lunch breaks, and changed its telephone use

policy so that employees could use the company's telephones for personal calls only in emergencies. *NLRB II*, 330 NLRB No. 134, at *5. The NLRB has held in the past that telephone policies and lunch and break periods can constitute mandatory subjects of bargaining. *See Advertiser's Mfg. Co.*, 280 NLRB 1185, 1191 (1986) (stating that telephone use is a term or condition of employment and employee telephone privileges are a mandatory subject of bargaining), *enforcement granted*, 823 F.2d 1086 (7th Cir. 1987); *Garrison Valley Ctr., Inc.*, 246 NLRB 700, 709 (1979) (lunch and break periods are a mandatory subject of bargaining). Given the NLRB's longstanding position that telephone, lunch, and break policies are mandatory subjects of bargaining, we find that substantial evidence supports the NLRB's conclusion that Pepsi's changes to these policies effected impermissible, unilateral, and material changes to the terms and conditions of employment.

### 3.   *Method of Compensation for Salesmen and Drivers*

The NLRB concluded that because § 8(d) of the Act, 29 U.S.C.A. § 158(d), requires employers to bargain with a collective-bargaining representative regarding, specifically, "wages," Pepsi's move from a pure commission system to a system involving a lower commission plus an hourly wage, which reduced the pay of some employees (J.A. at 8-11), was the very paradigm of a forbidden unilateral change under the Act. Given § 8(d)'s specific mention of "wages" as a mandatory bargaining subject and the evidence indicating that Pepsi's new policy reduced the wages of at least some employees, it is clear that the NLRB correctly found the new compensation system for salesmen and drivers to be an impermissible unilateral change in wages.

### 4.   *Sparemen's Work Schedule*

In November 1992, Pepsi changed the work schedule for sparemen so that they no longer were responsible for filling in for drivers. The NLRB reasoned that § 8(d) requires employers to bargain regarding, specifically, "hours." In the past, the NLRB has held that even a relatively small change in working hours is a mandatory subject of bargaining under the Act. *Hedison Mfg. Co.*, 260 NLRB 590, 592-94 (1982) (holding that a five-minute change in employee starting time

is a mandatory subject of bargaining). In light of the well-established principle that working hours are a mandatory subject of bargaining, we cannot conclude that the NLRB erred in finding that Pepsi's changes to the sparemen's work schedules constituted an impermissible unilateral change in violation of 29 U.S.C. § 158(a)(5). Similarly, the NLRB's finding that Pepsi violated § 158(a)(5) by unilaterally changing the work schedules of merchandisers and route salesmen is supported by substantial evidence.

### 5. *Moving Violations Policy*

Pepsi argues that no record evidence establishes that the prior moving violations policy was different from the "new" policy, in that citations were always counted against the policy's limits unless and until an employee was entirely acquitted. Evidence in the record, however, indicates that Pepsi's prior policy applied only to "convictions" whereas under the new policy, citations counted against an employee's record unless and until an employee was acquitted. Further, the record also indicates that the new policy played a role in justifying the discharge of three employees, Hyatt, Lee, and Curtis. The record is not entirely clear as to the precise nature of the policy prior to the change, and Pepsi's argument that there was in fact no change is not without record support. On balance, however, we find that substantial evidence supports the NLRB's finding that Pepsi changed its policy so that unadjudicated citations immediately were counted against an employee's driving record, and that this change led to the discharge of Hyatt, Lee, and Curtis, rendering it material. The NLRB therefore did not err in finding that Pepsi's change to the moving violations and accidents policy was an impermissible unilateral change in the terms and conditions of employment.

### IV.

No substantial evidence exists to support the Board's conclusion that Parker was terminated based on the changed aspects of the zero-settlement policy; therefore, we deny enforcement of that portion of the Board's order that finds that his termination violated § § 8(a)(1) and 8(a)(5) of the Act and requires his reinstatement. Because the NLRB adduced sufficient evidence on remand indicating that the Union did not waive the right to bargain over any of Pepsi's unilateral

changes to policy, because the evidence indicates that Pepsi's withheld 1992 wage increase was not discretionary and was withheld based on anti-union animus, and because adequate evidence exists to permit the NLRB reasonably to conclude that each of Pepsi's unilateral changes was material in nature, we grant enforcement of the NLRB's order in all other respects.

*ENFORCEMENT GRANTED IN PART AND*
*DENIED IN PART*